UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT SYSTEMS OF MISSISSIPPI, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br> v. <br><br> TREEHOUSE FOODS, INC., SAM K. REED, DENNIS F. RIORDAN and CHRISTOPHER D. SLIVA, <br><br> Defendants. | Case No.: 16-CV-10632 <br><br> CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br> <u>JURY TRIAL DEMANDED</u> |

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

NATURE OF THE ACTION AND OVERVIEW .......................................................... 1

JURISDICTION AND VENUE .................................................................................... 6

PARTIES ...................................................................................................................... 6

NON-PARTY ............................................................................................................... 12

TREEHOUSE PRIOR TO THE CLASS PERIOD ..................................................... 12

    A.    Company Background ...................................................................... 12

    B.    The 2014 Flagstone Acquisition Is A Failure ...................................... 15

    C.    TreeHouse Failed to Properly Integrate Flagstone and Upgrade Its ERP System ............................................................................................. 22

    D.    TreeHouse Announces the Acquisition of Private Brands .................. 27

DEFENDANTS MISLEAD THE PUBLIC DURING THE CLASS PERIOD .......................... 32

    A.    The Offering on January 20, 2016 ...................................................... 32

    B.    February 1, 2016, Press Release Announces Completion of the Private Brands Acquisition ......................................................................... 34

    C.    Fourth Quarter and Full Year Ended December 31, 2015 ..................... 35

        1.    The February 11, 2016, Fourth Quarter and Full Year 2015 Press Release ........................................................................... 35

        2.    The February 11, 2016, Conference Call .................................. 35

        3.    2015 Form 10-K Filed February 18, 2016 .............................. 37

    D.    First Quarter Ended March 31, 2016 .................................................. 38

        1.    The May 5, 2016, First Quarter Press Release............................. 38

        2.    The May 5, 2016, Conference Call ........................................... 39

        3.    First Quarter 2016 Form 10-Q Filed May 5, 2016..................... 42

    E.    William Blair Growth Stock Conference, June 14, 2016 ..................... 42

    F.    The Integration Process Was Flawed.................................................. 44

    G.    Second Quarter Ended June 30, 2016 ................................................ 48

        1.    The August 4, 2016, Second Quarter Press Release..................... 48

        2.    The August 4, 2016, Conference Call......................................... 49

        3.    Second Quarter 2016 Form 10-Q Filed August 4, 2016............... 52

    H.    The September 7, 2016, Barclay's Global Consumer Staples Investors Conference .................................................................................. 52

THE TRUTH EMERGES ........................................................................................... 54

    A.    TreeHouse Reveals That the Private Brands Sales Staff Was Ill-Prepared to Achieve Revenue Growth .................................................................................. 54

    B.    TreeHouse Takes a $333.4 Million Write-Down of Flagstone Goodwill ............ 68

DEFENDANTS' PUBLIC STATEMENTS WERE STATEMENTS OF EXISTING FACTS THAT WERE MATERIALLY FALSE AND MISLEADING AT THE TIME MADE ...................................................................................................................... 69

    A.    Defendants Misrepresented and Failed to Disclose Material Facts Concerning Flagstone's Operations and Goodwill Impairment .......................... 69

    B.    Defendants Misrepresented and Failed to Disclose The Problems At Private Brands ............................................................................................................... 76

LOSS CAUSATION .................................................................................................. 79

SCIENTER ALLEGATIONS ..................................................................................... 80

APPLICABILITY OF PRESUMPTION OF RELIANCE  (FRAUD-ON-THE-MARKET DOCTRINE) ............................................................................................................... 90

NO SAFE HARBOR .................................................................................................. 93

CLASS ACTION ALLEGATIONS ............................................................................ 93

FIRST CAUSE OF ACTION ..................................................................................... 95

SECOND CAUSE OF ACTION ................................................................................. 99

PRAYER FOR RELIEF ........................................................................................... 100

JURY TRIAL DEMANDED .................................................................................... 101

## INTRODUCTION

The Public Employees' Retirement System of Mississippi ("MSPERS" or "Lead Plaintiff"), the Court-appointed Lead Plaintiff, by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning MSPERS, which are alleged upon direct knowledge. MSPERS's information and belief is based upon, among other things, its counsel's investigation, which includes without limitation: (a) analyses of regulatory filings made by TreeHouse Foods, Inc. ("TreeHouse" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) analyses of press releases and investor presentations and conference calls issued or disseminated by TreeHouse; (c) analyses of news stories, internet postings and other publicly available information concerning TreeHouse; (d) consultations with experts on accounting; (e) interviews of former TreeHouse employees; (f) consultations with experts on the private label food business; and (g) interviews of TreeHouse competitors and customers. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a securities fraud class action on behalf of all persons and entities who purchased TreeHouse common stock between January 20, 2016, and November 2, 2016, inclusive (the "Class Period"), seeking to pursue remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the SEC against TreeHouse and certain of its current and/or former executives. The "Individual Defendants" are Sam K. Reed (TreeHouse's Chairman and Chief Executive Officer), Dennis F. Riordan (TreeHouse's former Chief Financial Officer and current President), and

Christopher L. Sliva (TreeHouse's former President) (the Individual Defendants and the Company are referred to collectively as "Defendants").

2.     TreeHouse manufactures private label or "store brand" food products for grocery stores, warehouse chains, and other retailers, and also assists its customers in designing new products to develop their own brands.  Since its founding in 2005, TreeHouse has expanded aggressively across a wide range of products, and now has a market capitalization exceeding $4 billion.  Its wide range of products include pickles; non-dairy creamers; Mexican sauces, salad dressings, and other sauces; hot cereals; boxed dinners; aseptically packaged soups and broths; single-serve beverages (such as coffee cups for Keurig coffee brewers); and snack nuts, trail mixes, dried fruit, and other snacks.  Its largest customer is Walmart Stores, Inc.

3.     TreeHouse has grown through a steady stream of acquisitions, purchasing twelve companies since 2006, which have resulted in a tenfold increase in revenues.  As defendant Reed told investors on November 2, 2015, "Since our founding ten years ago, our strategy has been to drive shareholder value by consolidating supply of private label brands."  Throughout the acquisitions, Defendants cultivated, through its public statements, a reputation that the Company's executives could smoothly integrate these new purchases into the broader organization without significant problems.

4.     In July 2014, seeing a need to increase the size of their acquisitions to maintain growth levels the market had come to expect, TreeHouse purchased Flagstone Foods ("Flagstone"), a competitor that sold snack nuts, trail mixes, dried fruit, and other healthy snacks, for approximately $854 million.  At the time, this was, by far, TreeHouse's largest acquisition.

5.     The Flagstone acquisition and integration was troubled from its inception. TreeHouse was unable to optimize its operations of Flagstone for a number of reasons, including

that TreeHouse was unable or unwilling to convert Flagstone to the same enterprise resource planning software TreeHouse was using. Although Defendants consistently represented prior to, and during, the Class Period that TreeHouse was taking "great steps toward the integration" of Flagstone into TreeHouse (¶ 55; February 12, 2015, press release), in fact, nothing could be further from the truth. Indeed, Flagstone was operating without achieving the synergies represented by Defendants to exist.

6.     The failures with Flagstone eventually led TreeHouse to write down the value of Flagstone's goodwill by $333.4 million (equivalent to 65.2% of Flagstone's stated $511.3 million goodwill and 39.1% of the $854.2 million purchase price).

7.     Notwithstanding its difficulties in operating and integrating Flagstone, TreeHouse determined in late 2015 to "triple down" its bet on its acquisition strategy and acquire the "Private Brands" business from ConAgra Foods, Inc. for more than $2.7 billion in cash—a far larger acquisition than even Flagstone. TreeHouse had been unable since inception to generate significant organic growth. Rather, based on defendants' public statements, investors had come to expect growth through successively larger acquisitions. Prior to the Private Brands acquisition, TreeHouse's acquisitions cost approximately $2.6 billion. *See, e.g.*, ¶ 43. With the purchases of Flagstone and Private Brands, TreeHouse would ostensibly expand its revenues by $3.9 billion (or 2.7 times) from 2013 ($2.3 billion in revenue) to 2016 ($6.2 billion in revenue).

8.     However, leading up to the Private Brands acquisition, Defendants determined that TreeHouse could not let the market know about the problems it was facing integrating Flagstone or else investors and lenders would lose faith in the Company, preventing TreeHouse from issuing the substantial debt and additional stock necessary to purchase Private Brands. TreeHouse needed to be perceived by the market as a company that was successful at its core

3

operating and growth strategy—the successful acquisition, integration and operation of accretive target companies. Defendant Riordan was motivated, in particular, because he was planning to retire, and the perceived success of the Flagstone and Private Brands transactions would affect his legacy and his substantial equity holdings in TreeHouse.

9. In the wake of the Private Brands acquisition, TreeHouse continued to reassure the market, as before, that the integration of both Flagstone and Private Brands would be, and was, a success, just like (purportedly) all of its prior acquisitions had been. For instance, Defendants repeatedly assured the market that they were "well on our way towards the successful integration of Private Brands" (¶ 218; August 4, 2016, conference call) and made other misrepresentations about the integration process.

10. As set forth below, however, contrary to Defendants' false and misleading statements and assurances, the Private Brands business experienced the same integration, growth, and profitability problems that plagued Flagstone. When the truth could no longer be contained, TreeHouse and defendants Reed and Riordan ultimately disclosed on November 3, 2016, that the Company's third quarter operating results would be substantially below analysts' expectations, due primarily (according to Defendants) to known (but undisclosed) deficiencies in the Private Brands sales staff. TreeHouse disclosed that third quarter GAAP earnings were $0.65 per share,[1] a full $0.13 below analysts' estimates and $0.10 below the bottom range of TreeHouse's third quarter estimates of $0.75-$0.80 per share. TreeHouse also lowered its full year adjusted earnings per share forecast to $2.80 to $2.85 per share from $3.00 to $3.10 per share due to underperformance of the Private Brands acquisition. On that very day, the Company also

---

[1] Unless otherwise noted, (i) all references to earnings per share are to earnings per fully diluted share (as reported by TreeHouse), and (ii) all emphasis is added.

surprised investors by announcing the resignation of defendant Sliva, who joined TreeHouse in 2012 but had been President of the Company for only three months.

11.  Defendants blamed the botched integration of Private Brands into TreeHouse for the earnings decline.  For example, the Company reported that the Private Brands sales staff was "overloaded . . . with an administrative workload that interfered with their day jobs."  Defendants also later acknowledged that "*[w]e knew* our very quick growth had made it just too difficult for our customer-oriented teams to fully understand the 32 product categories we sell."  Among the factors noted by analysts for the poor operating results was the lack of integration between Flagstone and the comparable Private Brands business.  *See, e.g.*, ¶¶ 259-260 (Wells Fargo November 4, 2016, research report).

12.  After revealing the bad news on November 3, 2016, the Company's shares fell $16.87 per share, or nearly 20%, to close at $69.72 per share on that day.  Reported trading volume on November 3, 2016 was 7.2 million shares, more than ten-times the average daily trading volume of TreeHouse shares during the Class Period.

13.  Many of the analysts who covered TreeHouse expressed shock at Defendants' admissions.  For example, an analyst at Citi wrote, "At a recent conference, management suggested things were ok on [Private Brands], but now it looks like the situation is quite a bit worse."  ¶ 248.  Likewise, analysts at SunTrust were "disturbed by the departure of Chris Sliva" in the merger integration fall-out as he "quickly moved up through the ranks since he joined the company six years ago and was basically the #2 person at the company."  ¶ 253.

14.  As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, caused thereby, Lead Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

15.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange

Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17

C.F.R. § 240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action pursuant to

28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

17.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and

Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the

alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts

charged herein, including the dissemination of materially false and/or misleading information,

occurred in substantial part in this Judicial District, as TreeHouse is based in this District.

18.     In connection with the acts, conduct and other wrongs alleged in this Complaint,

Defendants directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mail, interstate telephone communications and the

facilities of a national securities exchange.

## PARTIES

19.     MSPERS serves the state of Mississippi by providing retirement benefits for

individuals working in state government, public schools, universities, community colleges,

municipalities, counties, the state's Legislature, highway patrol, and other such public entities.

As of June 30, 2016, MSPERS had approximately $28.8 billion in assets and served a total of

399,757 members and 102,212 retirees and beneficiaries.  As set forth in its certification

previously filed with the Court (Dkt No. 35-2), MSPERS purchased TreeHouse common stock

on the NYSE during the Class Period, and suffered losses of approximately $5.4 million as a

result of the federal securities law violations and false and misleading statements and material omissions alleged herein.[2]

20.     Defendant TreeHouse is incorporated in Delaware and the Company's principal executive offices are located in Oak Brook, Illinois.  TreeHouse's common stock trades on the NYSE under the symbol "THS."

21.     Defendant Sam K. Reed ("Reed")  has served at all relevant times as the Company's Chief Executive Officer and Chairman of TreeHouse's Board of Directors.  As stated in TreeHouse's 2016 Proxy Statement dated March 2, 2016, Form DEF 14A ("2016 Proxy"), Reed purported to have extensive experience in the food service industry and represented that he was uniquely qualified to plan and execute on TreeHouse's business operations, and its acquisition strategy:

> Mr. Reed has served as our Chairman and Chief Executive Officer since January 27, 2005 and as President since July 1, 2011. Prior to joining us, Mr. Reed was a principal in TreeHouse LLC, an entity unrelated to the Company that was formed to pursue investment opportunities in consumer packaged goods businesses. From March 2001 to April 2002, Mr. Reed served as Vice Chairman of Kellogg Company. From January 1996 to March 2001, Mr. Reed served as the President and Chief Executive Officer, and as a director of Keebler Foods Company.  Prior to joining Keebler, Mr. Reed served as Chief Executive Officer of Specialty Foods Corporation's (unrelated to Dean Foods, as defined below) Western Bakery Group division from 1994 to 1995. Mr. Reed has also served as President and Chief Executive Officer of Mother's Cake and Cookie Co. and has held Executive Vice President positions at Wyndham Bakery Products and Murray Bakery Products. In addition to our Board, Mr. Reed has previously served on the boards of directors of Weight Watchers International, Inc. and Tractor Supply Company. Mr. Reed holds a B.A. from Rice University and an M.B.A. from Stanford University.
>
> We believe that as our Chairman and Chief Executive Officer, Mr. Reed has led a transformation of the Company focused on increasing value for customers and stockholders. With Mr. Reed's broad experience and deep understanding of the

---

[2] MSPERS had no trading in TreeHouse common stock during the portion of the Class Period not covered by its certification (January 20 through January 31, 2016).

Company and the food industry, and as Chief Executive Officer, he provides leadership and industry experience to the Board and to the Company.

22.     TreeHouse's 2016 Proxy similarly lauded Mr. Reed's strategic vision as being right for the Company at this time, emphasizing that having him in his role as TreeHouse's CEO and Chairman "ensures clear accountability":

> The Board has determined that the appropriate leadership structure for the Board at this time is for Mr. Reed, our Chief Executive Officer and President, to serve as Chairman of the Board. . . .  Mr. Reed possesses detailed and in-depth knowledge of the issues, opportunities, and challenges facing the Company and its businesses and is thus best positioned to develop agendas that ensure that the Board's time and attention are focused on the most critical matters. His combined role enables decisive leadership, ***ensures clear accountability***, and enhances the Company's ability to communicate its message and strategy clearly and consistently to the Company's stockholders, employees, customers, and suppliers, particularly during times of turbulent economic and industry conditions.

23.     According to the Company's 2017 Proxy Statement dated March 2, 2017 ("2017 Proxy"), Reed was paid total compensation of $8,503,399, $6,478,982, and $6,402,602, for 2016, 2015, and 2014, respectively (substantial parts of which were in stock and stock option awards).

24.     In addition to his high seven-figure annual cash compensation, according to TreeHouse's 2016 Proxy, as of February 26, 2016, defendant Reed beneficially owned 948,414 shares of TreeHouse common stock, consisting of 17,433 shares of TreeHouse common stock directly held, 599,217 shares jointly held in family trusts, and 331,764 shares of common stock issued under options currently exercisable within 60 days of February 26, 2016 (excluding other stock option grants and restricted, unvested stock).  Based on TreeHouse's closing price of $85.50 per share on February 26, 2016, and his ownership of 616,650 shares of TreeHouse common stock, defendant Reed's equity interest in TreeHouse was more than $50 million.

25.     Research indicates that defendant Reed only bought 20,000 shares of TreeHouse stock at market prices, and last purchased shares at market prices in 2007. Almost his entire equity interest is the result of grants from TreeHouse.

26.     Defendant Riordan has served at all relevant times as the Company's Chief Financial Officer ("CFO"). He currently serves as the Company's President effective November 3, 2016, and previously served from July 1, 2011 until November 3, 2016 as TreeHouse's Executive Vice President and CFO. Defendant Riordan led the integration efforts at Flagstone on its acquisition by TreeHouse.

27.     As stated in the 2016 Proxy, Riordan has extensive experience in corporate finance:

> From January 3, 2006 to July 1, 2011 Mr. Riordan was Senior Vice President and Chief Financial Officer of the Company. Prior to joining us, Mr. Riordan was Senior Vice President and Chief Financial Officer of Océ-USA Holding, Inc., a manufacturer of printers and printing supplies and services, where he was responsible for the company's financial activities in North America. Mr. Riordan joined Océ-USA, Inc. in 1997 as Vice President and Chief Financial Officer and was elevated to Chief Financial Officer of Océ-USA Holding, Inc. in 1999. In 2004, Mr. Riordan was named Senior Vice President and Chief Financial Officer and assumed the chairmanship of the company's wholly owned subsidiaries Arkwright, Inc. and Océ Mexico de S.A. Prior to his employment with Océ-USA, Mr. Riordan held positions with Sunbeam Corporation, Wilson Sporting Goods and Coopers & Lybrand. Mr. Riordan has also served on the boards of directors of Océ-USA Holdings, Océ North America, Océ Business Services, Inc. and Arkwright, Inc., all of which are wholly owned subsidiaries of Océ NV. Mr. Riordan is a Certified Public Accountant and holds a B.A. from Cleveland State University.

28.     According to TreeHouse's 2017 Proxy, defendant Riordan was paid total compensation of $2,533,318, $1,980,330, and $2,033,728, for 2016, 2015, and 2014, respectively (substantial parts of which were in stock and stock option awards).

29.     In addition to his substantial annual cash compensation, according to TreeHouse's 2016 Proxy, as of February 26, 2016, defendant Riordan beneficially owned 182,259 shares of

9

TreeHouse common stock, consisting of 49,345 shares of TreeHouse common stock directly held and 132,914 shares of common stock issued under options currently exercisable within 60 days of February 26, 2016 (excluding other stock option grants and restricted, unvested stock). Based on TreeHouse's closing price of $85.50 per share on February 26, 2016, and his ownership of 49,345 shares of TreeHouse common stock, defendant Riordan's equity interest in TreeHouse was more than $4 million. Research indicates that defendant Riordan only bought 5,000 shares of TreeHouse stock at market prices, and not since 2007. Almost his entire equity interest is the result of grants from TreeHouse.

30. Defendant Sliva served as President of TreeHouse from August 4, 2016, until shortly before the announcement of his resignation on November 3, 2016. As President, defendant Sliva was responsible for the operations of TreeHouse's Bay Valley Foods and Private Brands divisions. Prior to serving as TreeHouse President, Sliva served as Executive Vice President and Chief Operating Officer of TreeHouse Foods and President of Bay Valley Foods.

31. As stated in the 2016 Proxy, Sliva has extensive experience in the food service and other industries:

> Prior to joining us, Mr. Sliva held various positions for Dean Foods from March 2006 to June 2012, including Chief Commercial Officer for the Fresh Dairy Direct Business from February 2011 to June 2012, and President and Chief Operating Officer of the Dean Foods subsidiary, Morningstar, from December 2007 to February 2011. From 2006 to 2007, Mr. Sliva served as Chief Customer Officer for WhiteWave Foods. Mr. Sliva held various positions for Eastman Kodak Company between March 2000 and February 2006, including Vice President and General Manager, Consumer Printing from 2003 to 2006; Vice President of Sales, North American Consumer Division from 2001 to 2003; and, Vice President and General Manager, Kodak Retail Services from 2000 to 2001. Prior to his service at Eastman Kodak Company, Mr. Sliva held a variety of sales and marketing positions for Fort James Corporation from 1992 to 2000, and for Procter and Gamble Distributing Company from 1985 to 1992. Mr. Sliva holds a B.A. degree from Washington University.

32.     According to TreeHouse's 2017 Proxy, Sliva was paid total compensation of $2,123,577, $1,872,960, and $1,938,639 for 2016, 2015, and 2014, respectively (substantial parts of which were in stock and stock option awards).

33.     In addition to his substantial annual cash compensation, according to TreeHouse's 2016 Proxy, as of February 26, 2016, defendant Sliva beneficially owned 56,583 shares of TreeHouse common stock, consisting of 12,436 shares of TreeHouse common stock directly held and 44,147 shares of common stock issued under options exercisable within 60 days of February 26, 2016.  Based on TreeHouse's closing price of $85.50 per share on February 26, 2016, and his ownership of 12,346 shares of TreeHouse common stock, defendant Sliva's equity interest in TreeHouse was more than $1 million.

34.     The Individual Defendants, Reed, Riordan, and Sliva, as the senior-most executive officers at TreeHouse, possessed the power and authority to control the contents of TreeHouse's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional and other investors.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  The Individual Defendants have acknowledged to investors that they had knowledge of TreeHouse's orders and sales by product on a daily basis. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

11

35.     All public statements made by the Individual Defendants prior to, during, and after the Class Period were within the scope of the Individual Defendants' employment and are attributable to TreeHouse for purposes of liability.

## NON-PARTY

36.     Rachel Bishop ("Bishop") has been the Company's Senior Vice President and Chief Strategy Officer since 2014.  According to TreeHouse's 2017 Proxy, Bishop was paid total compensation of $1,792,859, $1,034,520, and $2,024,115, for 2016, 2015, and 2014, respectively (substantial parts of which were in stock and stock option awards).

37.     Bishop is the Integration Lead of the Company's integration committee ("Steering Committee") to lead the integration process of Private Brands.  The Steering Committee comprised of senior executives from both TreeHouse and the Private Brands business, including Bishop and defendant Riordan.  As the Integration Lead, Bishop had "direct leadership of dedicated operational teams for sales, go-to-market, and human resource teams, as well as the workgroups tasked with integrating support functions and capturing related synergies" according to analysts at William Blair.  As stated in TreeHouse's 2016 Proxy, Bishop is one of the five listed "highly compensated officers" at TreeHouse and is purported to have extensive experience in the retail and consumer industries.

## TREEHOUSE PRIOR TO THE CLASS PERIOD

A.      **Company Background**

38.     TreeHouse is a private label food and beverage manufacturing company with more than 16,000 employees in over 50 plants in the United States, Canada, and Italy.

39.     TreeHouse is a Delaware corporation incorporated on January 25, 2005, by Dean Foods Company to accomplish a spin-off of certain specialty businesses to its shareholders. This spin-off was completed on June 27, 2005. 2016 Form 10-K at 4.

40.     TreeHouse's primary business is the manufacture and sale of private label goods, which are owned and associated with supermarket or warehouse chains. The tradenames to those products are owned by the retailer. TreeHouse manufactures and assists in the design and marketing of the private label products.

41.     According to the third quarter 2016 Form 10-Q, as of October 31, 2016, TreeHouse had approximately 56.7 million common shares outstanding and a market capitalization of approximately $5.0 billion.

42.     TreeHouse is primarily a consolidator of complementary businesses. TreeHouse's initial products comprised pickles, non-dairy creamer, and aseptic (specially manufactured and preserved) products.

43.     According to its Form 10-K for the year ended December 31, 2015 ("2015 Form 10-K"), TreeHouse purchased 10 principal companies in its first 10 years of operations (*see* 2015 Form 10-K at 4):

- On April 24, 2006, the Company acquired the private label soup and infant feeding business from Del Monte Corporation, for approximately $275 million.
- On May 31, 2007, the Company acquired VDW Acquisition, Ltd., a manufacturer of Mexican sauces, for $88.5 million.
- On October 15, 2007, the Company acquired the assets of E.D. Smith Income Fund ("E.D. Smith"), a manufacturer of salad dressings, jams, and various sauces, for approximately $220 million.
- On March 2, 2010, the Company acquired Sturm Foods, Inc., a manufacturer of hot cereals and powdered drink mixes, for $660 million.
- On October 28, 2010, the Company acquired S.T. Specialty Foods, Inc., a manufacturer of dry dinners, which include macaroni and cheese and skillet dinners, for $180 million.

13

- On April 13, 2012, the Company acquired substantially all of the assets of Naturally Fresh, Inc., a manufacturer of refrigerated dressings, sauces, marinades, dips, and other specialty items, for $26 million.

- On July 1, 2013, the Company acquired Cains Foods, L.P., a manufacturer of shelf stable mayonnaise, dressings, and sauces, for $35 million.

- On October 8, 2013, the Company acquired Associated Brands Management Holdings Inc., Associated Brands Holdings Limited Partnership, Associated Brands GP Corporation, and 6726607 Canada Ltd., a manufacturer of powdered drinks, specialty teas, and sweeteners, for approximately $180 million.

- On May 30, 2014, the Company acquired all of the outstanding equity interests of PFF Capital Group, Inc. ("Protenergy"), a manufacturer of broths, soups, and gravies, for $140.1 million, net of acquired cash.

- On July 29, 2014, the Company acquired Flagstone, a privately owned U.S. based manufacturer of branded and private label varieties of snack nuts, trail mixes, dried fruit, snack mixes, and other wholesome snacks, for $854.2 million, net of acquired cash, after adjustments for working capital.

44. As is readily apparent, Flagstone was by far the largest of those acquisitions.

45. Historically, TreeHouse has been slow to grow its businesses organically. In fact, Defendants acknowledged in TreeHouse's 2015 Form 10-K (at 15) that "[c]onsistent with our stated strategy, our future growth depends, in large part, on our acquisition of additional food manufacturing businesses, products or processes." That same statement is repeated in TreeHouse's Form 10-K each year.

46. For example based on TreeHouse's Form 10-Ks from 2005 through 2015, approximately $2.8 billion of TreeHouse's $3.2 billion in net sales reported for 2015 were derived from acquisitions.[3]

47. In 2015, TreeHouse made no major acquisitions and, as it had historically, its businesses failed to experience organic growth. Accordingly, TreeHouse's 2015 net sales,

---

[3] Taking into account $707,731,000 in net sales from acquisitions in 2005, $241,755,000 in 2006; $13,173,000 in 2007; $276,011,000 in 2008; $292,366,000 in 2010; $164,992,000 in 2011; $124,921,000 in 2013; $585,514,000 in 2014; and $414,268,000 in 2015.

without including revenues from acquisitions, declined year-over-year from $2.9 billion in 2014 to $2.8 billion in 2015.

**B.      The 2014 Flagstone Acquisition Is A Failure**

48.      On July 29, 2014, in a transaction almost seven times the size of its next-largest previous transaction, the Company acquired all of the outstanding shares of Flagstone. According to TreeHouse's SEC filings, "Flagstone is one of the largest manufacturers and distributors of private label wholesome snacks in North America, and is the largest manufacturer of private label trail mix in North America . . . .  The acquisition expanded our existing product offerings by providing the Company with an entrance into the wholesome snack food category, while also providing more exposure to the perimeter of the store."

49.      The purchase price for Flagstone was approximately $854.2 million, net of acquired cash, after adjustments for working capital.  As stated, Flagstone was by far TreeHouse's largest acquisition, prior to the Private Brands acquisition in February 2016.

50.      The press release announcing the acquisition stated that Flagstone was estimated to add $750 million of net sales and $0.24 to $0.28 per share of earnings accretion to TreeHouse's operations.

51.      According to TreeHouse's 2013 Form 10-K, it had approximately 36.5 million common shares outstanding as of January 31, 2014.  Thus, the estimate of earnings accretion was equivalent to between $87.6 million and $102.2 million.

52.      Not only was TreeHouse unable to generate organic growth from 2005 through 2015, but its 2014 acquisition of Flagstone was a disaster from the beginning.

53. On February 12, 2015, prior to the opening of the U.S. securities markets, TreeHouse issued a press release reporting financial results for the fourth quarter ended December 31, 2014.

54. The Company reported GAAP earnings of $0.78 and adjusted earnings of $0.99 per share for the fourth quarter of 2014, compared to GAAP earnings of $0.61 and adjusted earnings of $0.98 per share the prior year.

55. Defendant Reed stated in the press release that during the quarter TreeHouse "took great steps toward the integration of . . . Flagstone Foods."

56. Riordan stated during the conference call after the release of earnings, that during 2015 TreeHouse would make "additional investments in systems implementation to more quickly bring [Protenergy (a smaller 2014 acquisition) and Flagstone] onto our SAP platform." Q4 2014 Tr. at 7.

57. With regard to TreeHouse's business outlook, defendant Reed asserted that, given TreeHouse's historical successes with acquisitions, Flagstone would become "the cornerstone of another TreeHouse growth platform."

> Our first priority is to drive the top-line momentum that has historically generated double-digit growth at Flagstone. Our go-to-market teams at Bay Valley and Flagstone will collaborate in category management, customer brand innovation and product merchandising. Synergies will be derived from procurement and infrastructure economies of scale. Capital will be infused to drive productivity and to extend SAP to our largest business unit.

> Whatever the short-term difficulties, the long-term category trends are too compelling and the Flagstone team too talented for us to regard snack nuts, trail mix and dried fruit as anything other than the cornerstone of another TreeHouse growth platform. Q4 2014 Tr. at 8.

58. Defendant Reed added that "acquisitions will remain a primary means of strategic expansion." Q4 2014 Tr. at 8.

16

59. On February 19, 2015, the Company filed its annual report on a Form 10-K for the year ended December 31, 2014, ("2014 Form 10-K") with the SEC.

60. The 2014 Form 10-K reported 2014 operating difficulties with respect to Flagstone but expected "sales in the snack nuts category to return to historical norms and patterns of growth in 2015." 2014 Form 10-K at 24.

61. In 2015, Defendants promoted the Flagstone acquisition as a success.

62. Defendant Reed, in TreeHouse's press release reporting first quarter 2015 operating results, stated "We continue to be pleased with the integration progress of our recent acquisitions . . . . [W]e expect Flagstone Foods' growth to ramp up meaningfully in the back half of 2015."

63. On the conference call after the release of first quarter earnings, defendant Reed repeated that "Flagstone Foods remains the cornerstone of a multi-billion dollar better-for-you snacks platform in the making," and deflected any doubts as attributable to mere temporary lulls owing to a weak holiday season, which would be short-lived:

> In our snacks category, timing delays on new product placement and produce merchandising programs have slowed our acceleration after a weak holiday season. This temporary lull will be short-lived. In the interim at Flagstone we have installed a new president, developed new products, secured holiday bookings, invested in automation and diligenced acquisition candidates. While much has changed since its acquisition Flagstone Foods remains the cornerstone of a multibillion-dollar better-for-you snacks platform in the making. Thomson Reuters, Q1 2015 Earnings Call (May 7, 2015) ("Q1 2015 Tr.") at 3.

*See also* Thomson Reuters, Q2 2015 Earnings Call (Aug. 6, 2015) ("Q2 2015 Tr.") at 10 ("It's going to be the cornerstone of a multi-billion business because that's where millennial consumers have gone.").

64. Defendant Reed added on the call that "[i]mportantly, we will extend the SAP system to [Flagstone] as well . . . . [W]e've committed to a full SAP implementation and that

will provide us with the extraordinary go-to-market visibility that is going to be required to pursue this growth. [W]e remain committed to creating a multi-billion dollar snacks platform . . . and use Flagstone as the cornerstone of that business . . . . [T]here's absolutely not a single iota of change here with regard to the direction and our capability and strategy to have that play out favorably." Q1 2015 Tr. at 9, 13, 24.

65.     In the press release dated August 6, 2015, announcing financial result for the second quarter ended June 30, 2015, defendant Reed stated "we are showing signs of real progress and recovery at Flagstone Foods."

66.     Defendant Reed stated on the August 6, 2015, conference call that although Flagstone had experienced "difficulties since joining us last July[,]" "[t]heir second year . . . is already showing signs of real progress and recovery". Q2 2015 Tr. at 4:

> Innovation and merchandising initiatives, including a 3,800 store produce department rollout, have energized the whole of Flagstone.  The course of our top line has already been reversed and will generate escalating, double-digit growth across the third and fourth quarters.  Margins should expand more than 100 basis points this year, as automation, hedging and productivity programs are installed.  Although a year later than initially planned, Flagstone will prove to be the cornerstone of an eventual multi-billion dollar platform in better-for-you snacks.

67.     In the press release dated November 5, 2015, announcing financial results for the third quarter ended September 30, 2015, defendant Reed stated "[w]e made excellent progress at Flagstone Foods in the quarter and are encouraged by the outlook for the remainder of the year."

68.     The Form 10-Q for the third quarter 2015 reported (at 9) that "[t]he Company has allocated . . . $511.3 million of goodwill [from the Flagstone acquisition] to the North American Retail Grocery segment."  The third quarter Form 10-Q represented that the valuation of goodwill attributable to Flagstone (and therefore the justification for the $854.2 million purchase

price) "arises principally as a result of expansion opportunities related to Flagstone's product offerings in the snacking category."

69.     In its Form 10-K for 2015, TreeHouse reported net sales from Flagstone of $658 million, $92 million below the $750 million estimated at the time of its acquisition. Equally significant, TreeHouse had been unable or unwilling to install TreeHouse's SAP management system at Flagstone. The SAP installation was required for Flagstone to integrate its operations with TreeHouse and achieve operating efficiencies. *See* ¶ 91-93.

70.     At year-end 2015, notwithstanding the true state of Flagstone's affairs, TreeHouse continued to report $511.3 million of goodwill from the Flagstone acquisition on its balance sheet.

71.     TreeHouse's 2015 Form 10-K provided the following description of its procedures for assessing whether goodwill on its balance sheet was impaired. In fact, Defendants represented that "[o]f the six reporting units with goodwill, all have values that the Company considers to be substantially in excess of their carrying values (between 10% and 135%)."

72.     Investors reasonably understood from Defendants' disclosures that the current discounted cash flow from Flagstone's operations had a net present value as of December 31, 2015, of at least 110% of $511.3 million, or equivalent to $562.4 million.

73.     Defendants' statements however misrepresented and failed to disclose that the Flagstone acquisition had been a failure.

74.     As a result of drought conditions in California during 2014, the principal market in which almonds are grown, the cost of almonds and other raw materials skyrocketed. Although TreeHouse sought to pass the cost of raw materials onto consumers of its Flagstone private brand

products, the increased retail prices caused a substantial decline in demand for Flagstone products, and TreeHouse's sales of those products plummeted.

75.     The problems with Flagstone were exacerbated by Defendants' failure to integrate Flagstone onto TreeHouse's SAP platform.  Thus, Flagstone was operating on a separate management system.  TreeHouse had been unable to accomplish the operating synergies that were the premise for the acquisition.

76.     In a press release and investor call on February 9, 2017, after the end of the Class Period, defendants Reed and Riordan acknowledged that, because of Flagstone's historical failure from inception in 2014 to achieve projections necessary to support the $511.3 valuation of goodwill (no less the minimum 10% premium that Defendants had attributed to that goodwill), accounting principles required that TreeHouse write-off $333.4 million (or 65.2%) of the $511.3 million in goodwill attributable to Flagstone.

77.     TreeHouse's newly appointed CFO Matthew J. Foulston acknowledged on the February 9, 2017, investor call that "[s]ince [its acquisition in July 2014], Flagstone's performance has not delivered as we originally hoped . . . . ***Flagstone's shortfalls early in our ownership have weighed heavily on our discounted cash flow model, which in turn drives a goodwill analysis***."  Thomson Reuters, Q4 2016 Earnings Call (Feb. 9, 2017) ("Q4 2016 Tr.") at 6.

78.     Because Flagstone had been TreeHouse's largest acquisition, and the Defendants' business model was based primarily on growth through acquisitions, and synergies through the SAP system, Defendants had been reticent to disclose the truth during 2015 or thereafter during the Class Period (beginning January 20, 2016) concerning the Flagstone acquisition, even though it was their duty to do.

20

79.     Indeed, to the contrary, Wells Fargo stated in its research report on February 16, 2016, that it was led to believe that the Flagstone integration was "[m]eticulous" and that the success in Flagstone would assist in the integration of Private Brands.  For example, based on the Company's statements, this analyst report states:

> The meaningful improvements in operational efficiency from automation and simplification at legacy TreeHouse and Flagstone provide a template for similar efforts at the newly acquired business, particularly once IT systems are consolidated.  Importantly, the management team put in place last summer has been able to drive steady improvements in order fill rates and the business has posted five straight months of yr/yr profit growth.
>
> *       *       *
>
> The integration teams have been planning since November and given the importance of SAP implementation success, three people have been assigned to each task; one from TreeHouse, one from the acquired business, and one from the transition team.  Monthly milestones have been established for system transitions, customer transitions, and factory systems conversions.

80.     Defendants knew that if they had disclosed the truth concerning the substantial $864 million Flagstone acquisition, bond and stock investors and creditors would have been resistant to commit to the even larger planned $2.7 billion Private Brands acquisition, announced November 2, 2015, and would bid down the price of TreeHouse common stock.

81.     By not disclosing the Flagstone acquisition was in reality a failure, TreeHouse was able to finance the Private Brands acquisition with an $862.2 million common stock offering, and a private offering of $755 million in senior notes due 2024, at 6% *per annum*, announced on January 20 and 21, 2016, respectively.

82.     Disclosure of the truth would have made the Private Brands acquisition far more expensive, through the issuance of many more shares in a secondary offering at much lower prices.

21

83.     Investors and banks similarly would have been unwilling to lend TreeHouse money for the Private Brands acquisition at preferential rates.

**C.     TreeHouse Failed to Properly Integrate Flagstone and Upgrade Its ERP System**

84.     Enterprise resource planning (ERP) is the process by which a manufacturer manages and integrates the important parts of its business. An ERP management information system integrates areas such as planning, purchasing, inventory, sales, marketing, finance and human resources.

85.     CW1 joined TreeHouse through the acquisition of Flagstone in 2014. CW1 had been employed as a Senior Inventory Analyst at Amport Foods, a Flagstone company, from May 2014 to December 2015. He was a Materials Planning Manager at Flagstone from December 2015 to September 2016. CW1 reported to the Vice President of Procurement of Flagstone in St. Paul, Minnesota.

86.     CW1 was in a position to know the facts attributed to him in this Complaint.

87.     CW1 was advised that he would be identified in this Complaint as a confidential witness and was given the opportunity to review and correct the allegations attributed to him herein.

88.     Historically, many of TreeHouse's divisions operated on ERP software known as SAP. However, according to CW1, as of September 2016, Flagstone, was still not integrated into TreeHouse's SAP system even though the acquisition had closed over two years earlier and it was TreeHouse's largest division. Flagstone was being run autonomously of TreeHouse through a separate ERP system out of Flagstone's headquarters in St. Paul, Minnesota. As a result, TreeHouse had difficulty monitoring the Flagstone operations or establishing any synergy in the operations between Flagstone and TreeHouse's other operating divisions.

89. To CW1's knowledge, the only time any of the Individual Defendants visited the Flagstone operations in Minnesota was shortly after the acquisition of Flagstone. At that time, defendants Reed and Riordan spoke to Flagstone employees and said that Flagstone would be integrated onto TreeHouse's SAP management system and that the two businesses would experience operating synergies from the acquisition.

90. Beginning with TreeHouse's acquisition of Flagstone in 2014, CW1 was informed that TreeHouse would implement SAP at the St. Paul facility. Representatives of the TreeHouse corporate office in Chicago informed CW1 that "the first thing TreeHouse would do is revolutionize" the legacy Flagstone ERP system and implement SAP.

91. These statements were in line with the 2015 public statements Defendants made to investors. For example, in a conference call with analysts to discuss the fourth quarter of 2014 results held on February 12, 2015, defendant Riordan noted that operating expenses would increase in 2015 due to the "additional investments in systems implementation to more quickly bring our newest acquisitions onto our SAP platform." (Thomson Reuters, Q4 2014 Earnings Call (Feb. 12, 2015) ("Q4 2014 Tr.") at 7). Defendant Reed echoed these comments. *See* Q4 2014 Tr. at 8 ("Capital will be infused to drive productivity and to extend SAP to our largest business unit."). Similar comments were made by Reed at the May 7, 2015, conference call to discuss the first quarter 2015 results. Thomson Reuters, Q1 2015 Earnings Call (May 7, 2015) ("Q1 2015 Tr.") at 6, 9, 24. Reed again claimed that Flagstone and the other divisions would be "united under a common ERP platform" in 2016 on the conference call with analysts on August 6, 2015. Q2 2015 Tr. at 7.

92. CW1 was initially enthusiastic about the acquisition and purchased shares in TreeHouse common stock. However, months went by without any activity to integrate Flagstone

23

onto the SAP system. CW1 lost confidence in TreeHouse's ability or interest in managing Flagstone and sold his shares in 2015.

93.     In September 2015, with still no activity by TreeHouse to integrate Flagstone onto the SAP system, the Finance Director ("C.L"[4]) of Flagstone, instructed CW1 to begin changing the "lot codes" for inventory on Flagstone's system to correlate with the lot codes used by TreeHouse. This was necessary so that the SAP system could recognize the same products between the different divisions. Accordingly, CW1 began a month-long project of changing the lot codes in anticipation of converting Flagstone's ERP to SAP.

94.     However, CW1's counterpart at TreeHouse expressed no interest in the project and CW1 ceased his efforts at around the time of the Private Brands acquisition, when it became apparent that Flagstone would not be converted to the SAP system for some time. As a result, CW1's efforts to establish standardized procedures with TreeHouse "hit a brick wall."

95.     According to CW1, TreeHouse had no plans to install SAP software into Flagstone or the related nuts or trail mix Private Brands businesses until 2018.

96.     CW1 emphasized that his job as Materials Planning Manager was particularly unbearable because of a lack of adequate material planning software. The Flagstone operations in St. Paul utilized an ERP system by the name of Cimpro. Cimpro was developed in 1997, and was last updated in 2002, making it completely inadequate for the size of Flagstone's operation. As such, there was no strategic component for demand planning at Flagstone.

---

[4] Lead Plaintiff has identified certain TreeHouse employees by initials to protect their privacy. Lead Plaintiff expects that these persons can be identified by name by Defendants, but if not, Lead Plaintiff is willing to provide a "key" with full names to Defendants.

97.     As a work-around, the Vice President of Warehousing ("E.C.") at Flagstone, developed an Excel-based procurement planning system that was flawed in many ways and caused many inventory issues and order shortfalls for Flagstone in 2016.

98.     For instance, CW1 noted that purchase orders were entered into Cimpro and then emailed to the suppliers.  However, Cimpro was "just an earmarking tool: used for purchase orders and other related tasks, and the bulk of demand planning was performed using the Excel-based system E.C. had created."

99.     The Excel-based system was a "backward looking forecasting tool," as CW1 described it.  He noted that the system was used for demand planning, and incorporated estimated sales based on the prior year's actual sales and forecasted demand for a 12 week period going forward using these data.  The Excel-based system was flawed in many ways and caused many inventory issues.

100.    In order to run reports that he needed for demand planning purposes, CW1 had to load one report.  He then had to click through four different screens, type in commands, and email a report to himself, that was then uploaded into Excel.

101.    The inadequate demand planning Excel-based system, coupled with other issues meant that "Flagstone could not keep up with demand."  CW1 noted that the legacy Flagstone facility in North Carolina was momentarily "maxed out" and was unable to produce any more product to assist with the fulfillment challenges encountered at Flagstone.

102.    Additionally, a "bloat of inventory" resulted from the flawed Excel-based demand planning system.  CW1 explained that the legacy Flagstone demand planning system was not set up to handle the recall of sunflower seeds that occurred in the second quarter of 2016.  Demand essentially "doubled" in the Excel-based planning system as a result of the recall.

25

103.     CW1 further explained that the legacy Flagstone operations typically measured input inventory in terms of "days of inventory on hand" (DIOH).  Typical DIOH for sunflower seeds was 15 days.  However, in the wake of the Excel-based demand planning system malfunctioning in reaction to the sunflower seed recall, DIOH ballooned at some points to several hundred days.  This bloat of inventory included film and packaging, as well as raw goods.

104.     Due to failing performance at Flagstone as a result of mismanagement and inadequate information systems, Costco withdrew several of its pallet promotions.  CVS pulled half of its SKUs (stock keeping units) planned with Flagstone in the summer of 2016.  Moreover, Walmart pulled a quarter to one third of its June rollout because of Flagstone's failing performance.

105.     As CW1 emphasized, the reality was that "no one knew what real demand was." Because the planning was conducted in Excel and not on a system that could show the changes over time, the information presented in the Excel file was constantly changing.

106.     This lack of visibility was based in part on the poor communication from the sales teams.  The sales forecasts were entered into a system called SMART because "Chris [Sliva] wanted them to" do so.  The SMART data then rolled into the limited ERP program Cimpro for the purposes of demand planning.  Senior management at TreeHouse, including the Individual Defendants, had weekly if not daily access to Flagstone's order book.

107.     Orders often were placed several months in advance because Flagstone needed time to procure seasonal ingredients or products from overseas.  For example, Walmart would place orders for seasonal fruit items in May for fulfillment in October.

108. CW1 added that Flagstone sought to attain a 98% order fulfillment rate. However, given various performance issues, Flagstone was operating more along the lines of fulfillment rates in the 70 and 80% range.

109. According to conversations that CW1 had with members of senior management at Flagstone, the Individual Defendants were apprised of these order fulfillment rates.

110. CW1 left TreeHouse on his own accord in September 2016, after the work environment became "unbearable" for at least two reasons. First, there was considerable dissension between legacy Flagstone management and TreeHouse executive management. Second, the demand planning software at the legacy Flagstone facility in St. Paul was inadequate for the size of the operation. This was exacerbated by the fact that plans by TreeHouse to implement SAP at Flagstone were delayed.

**D.    TreeHouse Announces the Acquisition of Private Brands**

111. Notwithstanding the difficulties TreeHouse was experiencing in 2015 with the Flagstone acquisition, including the inability or unwillingness to migrate Flagstone to the SAP system, TreeHouse, in 2015 began to explore acquisition of the Private Brands company.

112. Private Brands is a manufacturer of private label products and a successor to Ralcorp Holdings, Inc. ("Ralcorp").

113. In 2013, Ralcorp was acquired by ConAgra for $6.8 billion, and subsequently renamed Private Brands. ConAgra was at that time primarily manufactured named brands.

114. The Private Brands acquisition was a fiasco for ConAgra because it was selling named brands (with high profit margins) and private label goods (with low profit margins) in competition with one another. By June 2015, ConAgra announced that it would sell the Private Brands business and exit the private label market.

27

115.     Private Brands was TreeHouse's largest competitor at that time.  Many of the private label products that Private Brands sold (such as snacks) were in competition with TreeHouse private label products.

116.     Defendants were motivated, given the lack of internal growth, to grow the business through ever-larger acquisitions.

117.     On November 2, 2015, notwithstanding the ongoing problems it was experiencing with the Flagstone acquisition, TreeHouse issued a press release prior to the opening of trading on the NYSE, announcing that it had signed a definitive agreement to acquire ConAgra's Private Brands operations.  The press release stated that the purchase price of $2.7 billion (plus $100 million in anticipated costs in connection with the acquisition) would be funded by a combination of $1.8 billion in new debt and approximately $1.0 billion in equity issuance.

118.     The press release stated that Private Brands had "sales of approximately $3.6 billion for the twelve months ended May 31, 2015," and that "[f]ollowing the acquisition, TreeHouse will have pro forma sales of nearly $7 billion and adjusted EBITDA of approximately $690 million."

119.     The press release added that "[t]he union of TreeHouse and ConAgra's private brands business establishes an industry leader in customer brands and custom products with significant scale, scope and skill and enables us to extend our reach in the grocery store by over 10 shelf stable and refrigerated food categories."

120.     The November 2, 2015, press release acknowledged that the acquisition would dilute first year's earnings by $0.20-$0.35 per share, but thereafter would be accretive to earnings.

121.     As reported by Bloomberg on November 2, 2015, the transaction would more than double TreeHouse's operations:

> The takeover will significantly bulk up TreeHouse's operations, expanding it to more than 50 manufacturing facilities, 16,000 employees and more than doubling its annual sales to almost $7 billion.

122.     To fund the purchase of the Private Brands business, the Company (i) completed a private offering of $775 million in senior notes at 6% *per annum*, (ii) raised $1.025 billion through a term loan, (iii) conducted a public offering of 13.3 million shares of common stock at a price of $65.00 per share for gross proceeds of $862.2 million, and (iv) drew-down the remaining balance from TreeHouse's Revolving Credit Facility.

123.     On the investor conference call convened subsequent to issuance of the November 2, 2015, press release, defendant Reed emphasized in his opening remarks the tenfold increase in TreeHouse's revenues from inception:

> Our acquisition of ConAgra private brands will not only mark our tenfold sales growth approaching $7 billion, but also our transformation from a brash upstart to the industry leader in private label foods.

Bloomberg, Acquisition of ConAgra Foods (Nov. 2, 2015) ("Nov. 2 Tr."), at 2.

124.     Stressing TreeHouse's purported integration capabilities and prowess, Reed emphasized that integrating Private Brands onto TreeHouse's SAP network, among other things, "provides both the ways and means to return those [Private Brands] customers that may have strayed from the fold."  Reed added that the combined company "will manufacture and distribute items in more than 20 major product categories."

125.     According to the Registration Statement dated January 20, 2016, Private Brands' largest division was "snacks" (a business similar to Flagstone), comprising an estimated $1.3 billion out of $3.9 billion (33%) in net sales for Private Brands' year-ending May 31, 2015.

126. Reed stated with regard to the combination of Flagstone and the Private Brands snack business, that "as Flagstone has continued to steadily show improvement, we're going to leverage that to the fullest." This was misleading because it failed to disclose the serious integration problems with Flagstone, which rendered Flagstone hardly anything to leverage.

127. Reed's prepared remarks also tried to reassure analysts' concerns whether the Company could handle such a large transaction by stressing TreeHouse's experience (and specifically its management's skill) at successfully integrating prior acquisitions—such as Flagstone—even though the integration of Flagstone was anything but a success:

> ***Given that this is our 12th major deal, our depth and breadth of experience should hold us in good stead throughout all phases of this business integration and transition.***
>
> In order to ensure our success in transforming our new private label organization into another TreeHouse powerhouse, Dennis Riordan has agreed to lead the acquired business as its Interim President and Chief Operating Officer. In this capacity, Dennis will maintain a dual role as our Chief Financial Officer, just as he did while serving as Interim Leader of Flagstone Foods last spring.
>
> He will direct an operating team of great skill and experience led by six industry veterans with an average seniority of 20 years, joined from the legacy ranks of ConAgra, Ralcorp and their prior acquisitions. In parallel, Bay Valley Foods, led by Chris Sliva, will be expanded to incorporate Flagstone Foods which will become its snacks division. Dennis and his team will be flanked by a dedicated integration team and project office led by our Chief Strategy Officer, Rachel Bishop, who directed similar exercises at Walgreens.
>
> Importantly, the former Chief Executive Officer of Ralcorp, Kevin Hunt, has joined our acquisition and integration team as a Senior Advisor. Kevin brings not only decades of industry experience, but also a deep appreciation for the nuances of private label. With all acting in close harmony, ***we can be assured that the execution of this transformative undertaking is in good hands***. (Nov. 2 Tr. at 3).

128. In fact, the ability to integrate such a large company was very important to the analysts, since the second question addressed at the post-merger announcement investor call was about how the Defendants expected to avoid the recognized integration problems that ConAgra

experienced when it purchased Private Brands from RalCorp a few years earlier. Defendant

Reed assured the audience that "we plan to do it right this time." He stressed that, unlike

ConAgra's integration effort, TreeHouse had the full support of the Private Brands executives

including the prior CEO; defendant Riordan was overseeing the process by applying his prior

integration experience; and TreeHouse had "actually started our [due diligence] project over a

year ago," providing "a far deeper understanding than is typically the case." Nov. 2 Tr. at 6.

129.    Another analyst specifically asked Riordan whether he had the capacity to take on

such a large role of overseeing the integration of a large company while he continued to serve as

CFO of TreeHouse, and Riordan responded with a comparison to his prior role overseeing the

integration of Flagstone ("I filled this role on an interim basis with Flagstone"), assuring him that

he was capable. Nov. 2 Tr. at 10.

130.    In response to a later question addressing investor concern that TreeHouse's

executives "are not good consolidators and . . . are not good at integrating these assets," Reed

strongly assured investors that "[w]ith regard to our capabilities to acquire and integrate these

businesses . . . that capability has only improved over a period of time." Nov. 2 Tr. at 17.

131.    Defendant Reed appeared as a guest on Jim Cramer's "Mad Money" program on

the CNBC business channel the evening of November 3, 2015, and emphasized again that the

ConAgra acquisition would enable TreeHouse to grow revenue tenfold within ten years. ("It's a

transformative event by any definition and in all dimensions.").

132.    As a result of Defendants' reassurances, analysts viewed the Private Brands

acquisition positively and expressed high confidence in TreeHouse's management to integrate

Private Brands. For example, on November 3, 2015, analysts at Wells Fargo Securities ("Wells

Fargo") noted in an analyst report that integration risk is reduced as TreeHouse has an

"experienced management team," "a well-developed integration team," and the hiring of Kevin Hunt as a senior advisor will help "to facilitate the integration."

133.    On November 17, 2015, analysts at Credit Suisse ("Credit Suisse") stated in an analyst report that now Private Brands business is "in the hands of a management team that understands how to manage the day-to-day complexity of private label and approaches the industry with a sensible strategic framework."

### DEFENDANTS MISLEAD THE PUBLIC DURING THE CLASS PERIOD

134.    Each of the Defendants' materially false and misleading statements alleged herein are statements or omissions of existing fact that were materially false and misleading at the time made.  Since many of defendants' public statements were materially false and misleading for the same reasons, to avoid unnecessary repetition, those reasons are not stated in this Section after each false statement, but rather, are grouped together by subject matter in the section headed "Defendants' Public Statements Were Statements of Existing Fact that Were Materially False and Misleading at the Time Made" (¶¶ 275-305).

**A.    The Offering on January 20, 2016**

135.    The Class Period begins on January 20, 2016.  Before the market opened on that day, the Company filed a preliminary prospectus supplement ("Preliminary Prospectus Supplement") dated January 20, 2016, pursuant to a November 20, 2013 S-3 Shelf Registration Statement ("Form S-3"), for the secondary offering of TreeHouse common stock to raise cash to close the Private Brands acquisition.  The Form S-3 had been signed by each of the Individual Defendants.

136.    After the close of trading on January 20, 2016, TreeHouse priced 11.54 million shares of TreeHouse common stock in a secondary offering at $65.00 per share.  The proceeds from the sale were used to acquire Private Brands.

137.    On January 22, 2016, before the market opened, the Company filed a prospectus supplement dated January 20, 2016, pursuant to Rule 424(b)(2) ("Prospectus Supplement"), in connection with the secondary offering of 13,269,230 shares (including the over-allotment of 1,730,769 shares) of TreeHouse common stock.  The Prospectus Supplement was otherwise identical to the Preliminary Prospectus Supplement.

138.    The Prospectus Supplement represented the Company's acquisition strategy and its "[s]ucessful track record of acquiring and integrating businesses":

> **{1}**[5] <u>Successful track record of acquiring and integrating businesses</u>.  Since we began operating as an independent entity in 2005, we have completed several acquisitions.  As a result of these efforts, we have expanded well beyond our original product base of pickles and non-dairy powdered creamer, adding numerous additional complementary, shelf stable food categories and expanding our product offerings into refrigerated products. **{1}** <u>We have a well-defined strategy for identifying, evaluating and integrating acquisitions that we believe differentiates us from many of our competitors. We believe that our proven acquisition capabilities will allow us to participate successfully in the ongoing consolidation trend among private label food product manufacturers.</u>  Prospectus Supplement at S-4.

139.    The Prospectus Supplement represented that the Company's "senior management team have significant packaged food industry experience and have worked on several successful ventures throughout their careers" and its **{2}** "<u>senior management team has demonstrated its ability to grow our business, increasing our net sales and our adjusted EBITDA through a</u>

---

[5] For ease of reference, all materially false and misleading statements are identified by bracketed numbers and underlined text.

combination of organic growth, portfolio optimization efforts and several complementary acquisitions." Prospectus Supplement at S-10.

140.     The Prospectus Supplement represented to investors the Company's growth strategies through its existing product portfolio and acquisitions:

> *Growth through acquisitions.* **{3}** <u>We believe we have the expertise and demonstrated ability to identify and integrate value-enhancing acquisitions.</u> We selectively pursue acquisitions of complementary businesses that we believe are a compelling strategic fit with our existing operations and will increase shareholder value. Each potential acquisition is evaluated for merit utilizing a rigorous analysis that assesses targets for their market attractiveness, intrinsic value, and strategic fit. **{4}** <u>We believe our acquisitions have been successful and consistent with our strategy</u>. Since we began operating as an independent company in 2005, our acquisitions have significantly added to our revenue base and allowed us to significantly diversify our product offerings. **{5}** <u>We attempt to maintain conservative financial policies when pursuing acquisitions and we believe that our proven integration strategies have resulted in deleveraging</u>. By identifying targets that fit within our defined strategies, we believe we can continue to expand our product selection and continue our efforts to be the low-cost, high quality and innovative supplier of private label food products for our customers. ***During 2014, we completed our most recent acquisitions of PFF Capital Group ("Protenergy") for approximately $143 million and Flagstone Foods for approximately $855 million.*** The Private Brands Business acquisition, valued at $2.7 billion, is our largest to date and further underscores our commitment to our acquisition strategy. Prospectus Supplement at S-10.

**B.     <u>February 1, 2016, Press Release Announces Completion of the Private Brands Acquisition</u>**

141.     On February 1, 2016, prior to opening of trading on the NYSE, the Company issued a press release announcing completion of the acquisition of ConAgra's Private Brands operations.  The press release contained the following statement:

> "We are pleased to have closed the acquisition, and **{6}** <u>will continue to focus on driving shareholder value and offering our customers value without compromise through economies of scale, quality products and superior customer service,"</u> said Sam K. Reed, Chairman, President and Chief Executive Officer of TreeHouse Foods.

**C.**     **Fourth Quarter and Full Year Ended December 31, 2015**

**1.**     **The February 11, 2016, Fourth Quarter and Full Year 2015 Press Release**

142.     On February 11, 2016, prior to the opening of trading on the NYSE, TreeHouse issued a press release announcing financial results for the fourth quarter and full year ended December 31, 2015.  For the fourth quarter of 2015, the Company reported GAAP earnings of $0.85 per share compared to $0.78 per share reported for the fourth quarter of 2015.  TreeHouse reported adjusted (non-GAAP) earnings per share in the fourth quarter of $1.08 compared to $0.99 in the fourth quarter of the prior year.  For the full year, adjusted earnings per share were $2.67 on net sales of $3.2 billion.

143.     Commenting on the Company's operating results, defendant Reed told investors in the press release:

> **{7}** We finished the year strong, and our employees deserve a great deal of credit for continuing to focus on improving our operations and driving excellent margin progress. While overall market conditions remained soft and weakness in the Canadian dollar persisted, both of which weighed on our top line, we are very proud to have delivered margin expansion of 150 basis points in the fourth quarter.

144.     The Company also announced that TreeHouse had named Riordan the Interim President and Chief Operating Officer of Private Brands.

**2.**     **The February 11, 2016, Conference Call**

145.     TreeHouse convened a conference call the morning of February 11, 2016, subsequent to the release of the fourth quarter 2015 operating results.  On that call Reed stated that **{8}** "[T]he integration of Private Brands [was] foreshadowed by the alignment of operating company into four consumer-based categories, beverages, condiments, meals and snacks, all going through our three channels of distribution."  He added that **{8}** "[a]ll early indications point to an integration process which will graph the Private Brands carve-out on to the main trunk of

our TreeHouse, generating synergies, expanding margins and opening new business." Thomson Reuters, Q4 2015 Earnings Call (Feb. 11, 2016) ("Q4 2015 Tr.") at 3.

146.     Riordan added on the earnings call that **{9}** "[w]hat we're finding is the teams are really doing well with the integration activities. The Private Brands teams have really rallied together very nicely, and frankly it's in better stead than we thought, and it's really a good management team." Q4 2015 Tr. at 8.

147.     Defendant Sliva added that Flagstone **{10}** "remains very sound. . . . [W]e think that business will grow at least in line with the category, and frankly our expectations are that we'd grow slightly faster than the space around us." Q4 2015 Tr. at 8.

148.     Defendant Riordan reconfirmed on the call that TreeHouse expected full year earnings per share to be in the range of $2.95 to $3.10, and projected first quarter earnings per share in the range of $0.38 to $0.43.  Riordan stated that TreeHouse would not project earnings for the three subsequent quarters until "we progress through the year."  Q4 2015 Tr. at 6. Riordan emphasized that "with a transformative acquisition like Private Brands, there are a lot of moving parts, and we want to be sure we get the cadence of sales and earnings right before we provide specific quarterly guidance for the rest of the year." Q4 2015 Tr. at 6.

149.     In fact, throughout the Class Period, Defendants emphasized on conference calls that it was difficult to estimate the timing of promotions more than one quarter in advance, and therefore would only issue quarterly guidance on the prior quarter's earnings call, conducted early in the second month of each quarter.  *See, e.g.,* ¶ 148.

150.     Given Defendants' experience in the industry, Reed's willingness to assume "clear accountability," and representations concerning the visibility and strength of TreeHouse operations, investors accorded a high degree of credibility to Defendants' quarterly earnings

projections.  *See, e.g.,* February 12, 2016 J.P. Morgan report ("During both the call and our follow-up conversation with management, we became increasingly confident that longer term guidance is conservative."); July 22, 2016 J.P. Morgan report ("2016 guidance has a lot of cushion, in our opinion.").

### 3.    2015 Form 10-K Filed February 18, 2016

151.    On February 18, 2016, the Company filed its annual report on Form 10-K for the year ended December 31, 2015, with the SEC, which was signed by, among others, defendants Reed and Riordan.  The Company reiterated the results previously published in its press release for the fourth quarter and full year 2015.

152.    TreeHouse's 2015 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Reed and Riordan, stating that the information contained in the 2015 10-K fairly presented, in all material respects, the financial condition and results of operations of the Company, and fully complied with the requirements of section 13(a) or 15(d) of the Exchange Act.

153.    The 2015 Form 10-K touted to investors the tremendous growth available for private label manufacturing in the United States:

> *Growth through acquisitions.* **{11}** <u>We believe we have the expertise and demonstrated ability to identify and integrate value-enhancing acquisitions.</u> We selectively pursue acquisitions of complementary businesses that we believe are a compelling strategic fit with our existing operations and will increase shareholder value.  Each potential acquisition is evaluated for merit utilizing a rigorous analysis that assesses targets for their market attractiveness, intrinsic value, and strategic fit. **{12}** <u>We believe our acquisitions have been successful and consistent with our strategy.</u> Since we began operating as an independent company in 2005, our acquisitions have significantly added to our revenue base and allowed us to significantly diversify our product offerings. We attempt to maintain conservative financial policies when pursuing acquisitions and we believe that our proven integration strategies have resulted in deleveraging. By identifying targets that fit within our defined strategies, we believe we can continue to expand our product selection and continue our efforts to be the low-cost, high quality and innovative

37

supplier of private label food products for our customers. ***During 2014, we completed our most recent acquisitions of PFF Capital Group ("Protenergy") for approximately $ 143 million and Flagstone for approximately $855 million***. On February 1, 2016, we completed the acquisition of the Private Brands Business from ConAgra Foods for $2.7 billion, subject to working capital and other adjustments.

154.    The 2015 Form 10-K revealed that Flagstone had contributed $657,993,000 in revenue to TreeHouse's operations in 2015, approximately $100 million below the projections made at the time Flagstone was acquired in 2014.

155.    The 2015 Form 10-K did not disclose Flagstone's contribution to either profit margins or profitability.

156.    **{13}** The 2015 Form 10-K repeated the same assurances with respect to Flagstone's $511.3 million of goodwill as had the 2015 third quarter Form 10-Q.

157.    **{14}** Those same representations were also repeated in the first and second quarter 2016 Form 10-Qs, filed on May 5, 2016 and August 4, 2016, respectively.

158.    Each of those statements were certified by defendants Reed and Riordan.

159.    BB&T Capital Markets ("BB&T") expressed confidence based on a meeting with management when its analysts met with management in late February 2016, and wrote in an analyst report on April 17, 2016, that it "got the sense that the Ralcorp integration was progressing nicely so far.  It is clear that Rachel [Bishop] and her team are going to be very methodical with this integration, which we applaud."

**D.    First Quarter Ended March 31, 2016**

**1.    The May 5, 2016, First Quarter Press Release**

160.    On May 5, 2016, prior to the opening of the NYSE, TreeHouse issued a press release reporting a first quarter GAAP loss per share of $0.06 (compared to a GAAP gain of $0.41 per share reported for the first quarter of 2015) and adjusted earnings per share of $0.48

38

(compared to $0.58 in the first quarter of the prior year).  Net sales for the quarter were $1.3

billion, "a 62.2% increase from 2015, driven by the Private Brands acquisition."

161.    TreeHouse reported "adjusted" earnings per share separate from "GAAP"

earnings to reflect non-recurring items such as expenses for acquisition, integration, and related

costs; mark-to-market adjustments; expense for restructuring and facility consolidation costs; and

gain on foreign currency remeasurement of intercompany notes.   The press release also reported

that TreeHouse had issued guidance for the second quarter of adjusted earnings per share in the

range of $0.50 to $0.55 per share, and "tighten[ed] full year 2016 adjusted earnings per share

guidance range to $3.00 to $3.10," with defendant Reed commenting in relevant part:

> **{15}** I am very pleased with the progress our teams are making integrating the
> Private Brands business, and our sense of functional unity is growing. Our Private
> Brands team is already making great progress in customer service improvements
> and is starting to regain lost distribution that resulted from past service issues. Our
> integration activities are on track and on budget as a result of the strong
> collaboration of our teams during the transition.

**2.    The May 5, 2016, Conference Call**

162.    During a conference call with analysts on May 5, 2016, defendant Riordan

represented that the Company is **{16}** "making good progress on the integration activities and our

sales teams are doing a great job of managing the sales process and working with their joint

customers."  Thomson Reuters, Q1 2016 Earnings Call (May 5, 2016) ("Q1 2016 Tr.") at 6.

163.    Reed added on the investor call that **{17}** "it is clear from our first 100 days'

experience that we are well along the right roadway to the TreeHouse promise of a new era in

food and beverage private label."  Q1 2016 Tr. at 7.

164.    **{18}** With respect to the "second 100 days," Reed stated that "we will lay the

operational and organizational foundations upon which to build the transformed TreeHouse of

our future.  The cornerstone of this construct is the integration of our legacy operating units with

39

the acquired Private Brands business into a single unified company, spanning all branches of our TreeHouse." Q1 2016 Tr. at 7.

165.    Reed also compared the current integration effort to TreeHouse's history of integrating prior acquisitions, stating that **{19}** "this is the best that I've seen since 2007 when E.D. Smith came in." Q1 2016 Tr. at 19.

166.    Defendants were asked on the call about the anticipated impact from the sunflower seed recall, and defendant Riordan responded that "we don't expect to have a material event based on what we know at this time":

> We've got less than 100,000 cases are affected so I think you can tell by that matter we don't expect to have a material event based on what we know at this time. So I think I'm expecting this to be a developing story but nothing significant at this time as we don't know of any illnesses or any other negatives as a result of this. Q1 2016 Tr. at 8.

167.    Riordan later confirmed that TreeHouse would not have to foot the bill for the recall: "The way this typically works is that it's the supplier's obligation. So we expect to be indemnified." Q1 2016 Tr. at 16.

168.    With regard to Flagstone, Sliva stated that "I think we're starting to see better price points, and we're starting to see some volume come back in [almonds]." Q1 2016 Tr. at 9.

169.    Riordan lauded the TreeHouse and Private Brands sales teams for "leveraging both of the businesses to present solutions to our customers that take advantage of the broader portfolio," and stated that because "there's about a six- to nine-month lead time between when you land private business and when you start shipping it," "it is news that will manifest itself late this year and really put us on a good footing for next year." Q1 2016 Tr. at 13, 14.

> That is starting to get some wins back, and I can't say enough about how **{20}** our two sales teams are leveraging both of the businesses to present solutions to our customers that take advantage of the broader portfolio. Couple that with the fact that some of the lost business that this Private Brands had over the last couple of

years which were service level related, didn't necessarily represent that their product wasn't the right product. And now that the service levels are back, we've got a few cases where customers are realizing that the choice they made, which we put them into, was not the best choice in the long run and we're starting to win back some based on quality. And so, that's got us energized a bit here, and it bodes well for the future. But as we've always said, there's about a six-month to nine-month lead time between when you land private business and when you start shipping it. So this is all great news, but it is news that will manifest itself late this year and really put us on a good footing for next year. Q1 2016 Tr. at 13-14.

170.    Riordan also stated on the May 5, 2016, investor call that TreeHouse was "expecting . . . adjusted earnings per share to be in a range of $0.50 to $0.55" in the second quarter. Q1 2016 Tr. at 6. He also confirmed that the Company was on track to meet its guidance: **{21}** "the bottom line is we've not seen anything that causes us to be concerned with our original full-year guidance." Q1 2016 Tr. at 6; *see also* Q1 2016 Tr.. at 7 ("Nothing has come up to make us think that [the three-year accretion estimate from Private Brands] is not very achievable.").

171.    On May 5, 2016, analyst Farha Asiam at Stephens wrote in an analyst report, "The Private Brands business has made solid progress of customer service improvements and is beginning to regain lost distribution. Integration activities remain on track and on budget."

172.    Similarly, Credit Suisse wrote a positive analyst report on May 5, 2016, wherein it stated that "management expects synergies to begin dropping to the bottom line in the second half of the year, and it expects to stabilize the sales declines as well" as there are "order fill rates near TreeHouse legacy business levels, and started to win back some lost business (first three wins are cookies and crackers, and involved in bids that could result in more wins)."

173.    TreeHouse common stock rallied 5.76% to close on May 5, 2016, at $90.43 in response to the May 5, 2016, conference call and positive reports by analysts based on the

41

Company's statements. The positive return on the shares was statistically significant at the 95% confidence level.

174. On May 8, 2016, Wells Fargo commented in an analyst report "that the Private Brands integration is off to a very strong start and this, combined with an increasingly rational branded pricing environment and a benign outlook for commodity costs, suggests that downside risk to FY16 EPS guidance is limited."

### 3. First Quarter 2016 Form 10-Q Filed May 5, 2016

175. On the same day, May 5, 2016, the Company filed a quarterly report for the period ended March 31, 2016, on a Form 10-Q ("first quarter 2016 10-Q") with the SEC, which was signed by defendant Riordan. The Company reiterated the financial results previously published in the press release issued earlier that day.

176. TreeHouse's first quarter 2016 10-Q contained signed certifications pursuant to SOX by defendants Reed and Riordan, stating that the information contained in the Form 10-Q fairly presented, in all material respects, the financial condition and results of operations of the Company, and fully complied with the requirements of section 13(a) or 15(d) of the Exchange Act.

### E. William Blair Growth Stock Conference, June 14, 2016

177. On June 14, 2016, Defendants spoke at a William Blair Growth Stock Conference ("William Blair Conference"). *See* Bloomberg, William Blair Growth Stock Conference (June 14, 2016) ("William Blair Tr.").

178. At the William Blair Conference, defendant Riordan emphasized that TreeHouse had been successful in acquiring and integrating eleven companies prior to Private Brands, and was positioned to continue its expansion through acquisition:

42

**{22}** <u>We've got a very experienced team. We are up to 16,000 people. We've got a lot of strong management. We've been around for a number of years and know the business very well and I think you'll continue to see us be very good operators for the assets you've owned here. We've done this before. This is our 12th major deal. You've never heard us come on in earnings call and talk about how we loved an integration with one of the other companies. And although this is significant in size relative to some of the others, every one of those were somewhat transformational. When we were $700 million, we bought a $300 million business that was transformational at the time, and we've been very successful in doing that.</u>  William Blair Tr. at 7.

179.     In discussing the progress of the integration, Sliva represented that the Company

**{23}** <u>"remain[ed] solidly on track to deliver the earnings that are built into our forecast."</u>  He also

stressed that the integration planning began a year before it became public, including a detailed

plan to handle "a lot of SKUs."  William Blair Tr. at 4-5.

180.     Consequently, the investing public and analysts were led to believe that the

"Private Brands integration is progressing smoothly and the business remains on track to deliver

on expectations," as stated by Stephens on June 17, 2016.

181.     In fact, as subsequently disclosed by Defendants, the Private Brands condiments

business, the first business to be consolidated with the legacy TreeHouse brands on the common

SAP platform, had experienced a 14.6% year-over-year decline in revenue in the first quarter and

was on track to experience a 14.8% year-over-year decline in the second quarter and a 22.2%

year-over-year decline in July 2016.

182.     Defendants had reason to know that Private Brands' other businesses, which were

not being consolidated onto the SAP system, would not experience improved operations until

after the third quarter at the latest when they too would be integrated into TreeHouse's SAP

system and have a reorganized sales staff.  *See, e.g.* ¶ 341, *infra*, ("[w]e knew our very quick

growth had made it just too difficult for our customer-oriented teams to fully understand the 32

products categories we sell.").

43

## F.  The Integration Process Was Flawed

183.  Over the course of the Class Period, each of the Individual Defendants continued to stress to analysts and the market that they were successfully managing the integration process and ensuring that the employees within Private Brands were not distracted by the integration.

184.  However, the complexity of TreeHouse's operations were only exacerbated after TreeHouse acquired Private Brands.  Private Brands lacked any coherent ERP, and had operated its businesses autonomously on completely different operating systems.

185.  CW2 is a former Senior Financial Analyst who was initially employed with ConAgra and joined TreeHouse through the ConAgra acquisition in February 2016.  He left the Company on his own accord in September 2016, after disagreements with the South Carolina pasta plant controller.

186.  CW2 was in a position to know the facts attributed to him in this Complaint.

187.  CW2 was advised that he would be identified as a confidential witness and was given the opportunity to review and correct the allegations attributed to him herein.

188.  CW2 was responsible for cost accounting and reporting for five legacy ConAgra pasta plants.  The South Carolina plant where he worked continued to operate on an old D0S-based ERP system throughout the duration of his employment at TreeHouse.  This system had been in use at ConAgra and there was no intention to migrate the pasta operations to SAP, on which TreeHouse operated.

189.  There were numerous different ERP systems in use at TreeHouse at the legacy ConAgra plants.  He estimated that there were about 25 plants that TreeHouse acquired from ConAgra, and they all used different ERP systems—SAP, QAD, JD Edwards, and DOS-based

44

systems. TreeHouse had plans at the time CW2 departed TreeHouse in September 2016 to migrate perhaps two of these plants onto SAP.

190. For financial reporting purposes, CW2 pulled cost data for the plants he was responsible for reporting on using Hyperion. He provided cost data for the pasta plant operations to Plant Controller ("K.T.").

191. K.T. ran additional financial reports, which were combined with other data put together by other pasta plant controllers. All of these reports were submitted to the regional controller on a monthly basis.

192. In the summer of 2015, ConAgra internally announced its intent to sell the Private Brands unit, according to CW2, and then embarked on a massive layoff of sales staff throughout the division under the direction of the new ConAgra CEO, Sean Connolly. "As soon as the new CEO came in, that's when a lot of changes started occurring. He immediately announced the sale of the private brands," CW2 said.

193. "From what I understood, ConAgra let go of a lot of expertise (in the) sales force that knew how to sell the private-brand label." Consequently, TreeHouse's efforts to push Private Brands sales were severely handicapped by these cuts. "TreeHouse were trying to contact prior RalCorp sales force that knew the private-brand industry a lot. Their goal was to get those folks back in there so they could get back to the customers and get that ball rolling again. That's the way I understood it."

194. In addition, CW2 explained that the plant in Excelsior Springs, Minnesota had been the flagship pasta plant under ConAgra's operation. However, following the TreeHouse acquisition, there were "huge" operational struggles at the Excelsior Springs plant. The plant went from doing 1 to 2 million pounds of pasta per day, down to 700,000 or 800,000.

45

195.    The acquisition of Private Brands also caused the exacerbation of the disarray in the other divisions such as Flagstone.

196.    The plan to implement SAP at Flagstone previously was moved from late 2015 to the end of 2016.  With the acquisition of Private Brands, the SAP implementation was further bumped into 2018, even though Flagstone desperately needed the ERP system update.

197.    To CW1, it seemed as if TreeHouse's plans for implementing SAP and integrating Flagstone and ConAgra centered on "pushing all [planned] system [integrations] back and seeing if we can get by."  CW1 noted that there was no real concerted effort to upgrade ERP systems at the legacy Flagstone or ConAgra facilities.  TreeHouse was centered on attempting to manage operations and integration without the much needed upgrades and universal ERP system.

198.    Upgrading the ERP system at the legacy Flagstone operations was of such importance that CW1's boss, Vice President of Procurement ("T.L"), traveled to Chicago in approximately April or May 2016 to plead for a software upgrade, as well as to discuss the problems related to the organization of the business and the unclear reporting issues.  Flagstone, however, was stuck using the Excel spreadsheet for managing procurement.

199.    CW1 was demoralized by the delayed SAP implementation.  He emphasized that Flagstone needed it more than anything else.  The customer service team could have benefitted from the new system to better assess order status and address customer concerns.

200.    The legacy Flagstone and ConAgra systems had very little communication with each other, and there was little to no insight at Flagstone about what the legacy ConAgra business was doing with respect to its customers at any time during CW1's employment.  While CW1 had discussions with "L.S.", Head of Procurement at ConAgra, there was very little contact with Private Brands and no systems or processes in place at TreeHouse at any time during

46

CW1's employment to integrate ConAgra and Flagstone, even though they had overlapping businesses, including customers at Costco, Kroger, Wegman's, and Meyer.

201.    There was some effort to allocate all of the nut business operations to Flagstone and the dried fruit and other related snack products to ConAgra.  But, even with this quasi-plan, there was total chaos and Flagstone did not have insight into what ConAgra was doing.

202.    There were supposed to be meetings between the legacy Flagstone and legacy ConAgra teams for planning purposes, but L.S. was the only ConAgra representative who showed up for these meetings.  Even though the legacy ConAgra business had individuals who worked on demand planning, such as the Head of Procurement at Private Brands, CW1 had very little interaction with these employees.  This was surprising and disappointing to CW1 because they worked for the same company and there was overlapping business between Flagstone and legacy ConAgra.

203.    Flagstone had achieved no benefits of integration with TreeHouse.

204.    According to CW1, there was always confusion and frustration pertaining to the reporting hierarchy within Flagstone.  For example, as CW1 explained, Flagstone's Executive Vice President of Product Supply ("M.B") continued to "call the shots" at Flagstone, with little input from TreeHouse executive management.

205.    M.B. "would do whatever was best for Flagstone," with little consideration for the impact his decisions had on TreeHouse.

206.    M.B. departed from TreeHouse in the fall 2016 timeframe.  Before leaving the company, M.B. made "disparaging comments" to CW1 and others about TreeHouse.  In particular, M.B. emphasized that TreeHouse was "not a sustainable business" because there were no processes in place to support the growth associated with the ConAgra acquisition.

**G.      Second Quarter Ended June 30, 2016**

   **1.      The August 4, 2016, Second Quarter Press Release**

207.     On August 4, 2016, before the market opened, TreeHouse issued a press release announcing second quarter financial results for the period ended June 30, 2016.  The Company reported GAAP earnings of $0.27 per share on net sales of $1.541.1 million, "a 103.0% increase from 2015, driven by the Private Brands acquisition."  Adjusted earnings per share were $0.54 per share.  The Company also reaffirmed its 2016 outlook, with defendant Reed stating in relevant part:

> We continue to progress in accordance with our plans for the year and our second quarter results represent further sequential improvement . . . . Our operating results continue to show steady improvement, as we focus on customers, categories, consumers, and organizational capabilities.
>
> **{24}** The detailed integration of legacy TreeHouse and Private Brands is well underway, and we are gaining momentum. [W]e completed a virtually flawless integration of the acquired condiments business onto the TreeHouse SAP system in early July, linking seven product categories and eleven plants that serve over 500 customers.  **{25}** The work that is being undertaken across the organization to establish standardized processes, organizational structures, functional responsibilities and reporting relationships is extraordinary and is a testament to the robust level of collaboration within our organization.

208.     Defendants, in the August 4, 2016, press release "reaffirmed [their] 2016 full year guidance range of $3.00 to $3.10 in adjusted earnings per fully diluted share" and stated that it "expects third quarter GAAP and adjusted earnings to be in the range of $0.75 to $0.80 per fully diluted share."

209.     Also on August 4, 2016, in separate press releases, the Company announced that defendant Riordan would retire as TreeHouse's CFO at the age of 59, and that Christopher D. Sliva had been elected President of TreeHouse Foods.  Defendant Reed commented on the appointment of defendant Sliva:

Chris' contributions over the last four years have both strengthened and advanced our organization and culture. I'm proud of the way Chris has led our Company through the operational complexity that is inherent in private label. Because of his leadership and efforts to focus our organization on simplification, our legacy business has delivered gross margin expansion year in, year out.

Chris has also been the driving force in focusing our organization on the private label fundamentals of customers, categories, consumers and organizational capabilities. As we look forward, it is under Chris' tutelage that we are designing an organizational structure to deliver on the transformative potential of the TreeHouse promise to our customers.

### 2. The August 4, 2016, Conference Call

210. During a conference call with analysts on August 4, 2016, defendant Reed represented that **{26}** "after a mid-summer conclave regarding the future vision of our TreeHouse . . . the integration of the Private Brands acquisition have not only been validated, but also accelerated as once former rivals are now united as one in our common cause." Thomson Reuters, Q2 2016 Earnings Call (Aug. 4, 2016) ("Q2 2016 Tr.") at 3. Defendant Riordan also represented on the call that the Company was on its way **{27}** "towards the successful integration of Private Brands and we have inherited a tremendous team that fits in seamlessly with the TreeHouse culture." Q2 2016 Tr. at 3. Reed also stated on the call that **{28}** "our transformation is gathering momentum and is well along the course to achieving its full strategic potential." Q2 2016 Tr. at 3.

211. Defendant Reed, in speaking about the Private Brands acquisition was unrestrainedly positive:

> **{29}** [O]ur initial concerns about the TreeHouse, Ralcorp ConAgra integration, those of grocery customers' skepticism and resistance have proven to be short-lived, as our valued partnership with grocers and customer brand development has extended across our now doubled product portfolio of more than two dozen major categories. Also in considering the financial synergies of our combination, we are on track to achieve all of its planned benefits. We are particularly pleased with the ready collaboration exhibited by our jointly formed procurement, operations, supply chains and IT teams. Q2 2016 Tr. at 3.

                                        *        *        *

**{30}** <u>With regard to the integration, the organizational changes that we're putting into place have absolutely no element of additional risk with regard to the integration. In fact, I think we will see that we will do better than originally thought, not related to Dennis's change to the Senior Advisory status, but related to the integration work that Rachel and her team have led, as well as the organizational changes that Chris is putting in place as we merge the two operating companies.</u>  Q2 2016 Tr. at 5.

212.    Defendant Sliva added on the August 4, 2016, call that:

The second quarter marked another period of progress in the legacy TreeHouse organization with the business moving forward both sequentially versus Q1 and on a year-over-year basis. This continued improvement in operating results emanates from an ongoing cultural shift from a focus predominantly on integrating acquisitions to an organization that must now balance integration with organic growth.

**{31}** <u>The seeds of this shift were planted roughly a year ago as our obsession with customer intimacy drove us to add customer facing resources and narrow the focus of our sales and marketing teams to a smaller set of highly adjacent categories within our portfolio.</u>  Q2 2016 Tr. at 3.

213.    Riordan similarly stated that the reorganization of the sales staff contributed to the

success of operations:

**{32}** <u>Our recent realignment of resources closer to our customer base is a key part of the growth story as we focused on smaller, more nimble teams that are accountable for all aspects of their businesses. This has not only helped us at the top line, but also increased our focus on product development as Chris has pointed out.</u>  Q2 2016 Tr. at 4.

214.    Riordan added that "overall" he was "pleased" with the success of the Flagstone

business:

I'll just quickly jump on Flagstone and that is the—yes, the numbers are up a bit and the comps are still rather difficult from last year . . . .  So I think overall we were relatively pleased.  I think it's clear we had to deal with a recall of sunflower seeds and that certainly didn't help matters in the quarter. Not that that affected the adjusted earnings as we showed, but it did have a bit of an effect on the top line sales at Flagstone.  So, overall, we're pleased and I think we're going to see a stronger fourth quarter, especially when we lap some of the lost business that took place when a customer went inside with manufacturing as opposed to having us supply that.  Q2 2016 Tr. at 13-14.

                                        50

215.   Sliva emphasized the progress along "several" categories, including snack nuts:

Our gains in the second quarter, however, extended beyond single serve coffee as several other categories, including hot cereal, carton soup and broth, pickles, tea and snack nuts showed year-over-year improvement. Our investments in consumer insights continued to pay dividends, manifesting in continued strong growth in the better-for-you and premium segments of our portfolio and providing the necessary learnings that prompted the launch of a new product line.  Q2 2016 Tr. at 4.

216.   Sliva also stated that TreeHouse had completed the integration of the Private

Brands condiments business onto a common TreeHouse SAP system.  He stated that:

Lastly, and perhaps most importantly, our organization proved that it could both grow the business and simultaneously integrate one of Private Brands' business units with a legacy TreeHouse unit. July 11 marked a major milestone in the combination of the two businesses by bringing all our condiments businesses on to a common TreeHouse SAP platform. The transition impacted a broad cross section of our customer base and we are happy to report that we have maintained service levels in line with our usual high standards throughout the transition. Q2 2016 Tr. at 4.

217.   Riordan added that **{33}** <u>"we are tracking very well to our forecast and</u>

<u>expectations for the year. . . . And with sales and operating costs remaining on track, we are</u>

<u>comfortable leaving our full year guidance of fully diluted adjusted earnings per share at $3 to</u>

<u>$3.10."</u>  Q2 2016 Tr. at 5.

218.   With regard to estimates for the third and fourth quarters, Riordan stated:

**{34}** <u>In looking at the third quarter of 2016, our internal budget for the year end most recent internal forecasts are still very much aligned on earnings.</u> . . . <u>[T]he company is in very good shape right now. We are well on our way towards the successful integration of Private Brands and we have inherited a tremendous team that fits in seamlessly with the TreeHouse culture.</u>  Q2 2016 Tr. at 6.

                              *        *        *

**{35}** <u>We've got an integration team that, frankly, is doing all the work.  And they're doing an incredible job.</u>  Q2 2016 Tr. at 12.

51

219.    Based on Defendants' representations, on August 4, 2016, Credit Suisse commented in an analyst report that "management continues to demonstrate it has a good handle on the Private Brands business with the integration running ahead of schedule and synergy targets remain on track."  Similarly, Citi wrote that "[h]eading into [TreeHouse's Q2] report, the critical focus of investors was the progress of the Private Brands (PB) transaction integration. Critically, PB's performance is meeting THS' expectations and the integration is on track."

### 3.    Second Quarter 2016 Form 10-Q Filed August 4, 2016

220.    On the same day, August 4, 2016, the Company filed a quarterly report for the period ended June 30, 2016, on a Form 10-Q ("second quarter 2016 10-Q") with the SEC, which was signed by defendant Riordan.  The Company reiterated the financial results previously published in its August 4, 2016, press release.

221.    TreeHouse's second quarter 2016 10-Q contained signed certifications pursuant to SOX by defendants Reed and Riordan, stating that the information contained in the Form 10-Q fairly presented, in all material respects, the financial condition and results of operations of the Company, and fully complied with the requirements of section 13(a) or 15(d) of the Exchange Act.

### H.    The September 7, 2016, Barclay's Global Consumer Staples Investors Conference

222.    On September 7, 2016, more than two months into TreeHouse's third quarter, the Individual Defendants and Company representative Rachel Bishop (TreeHouse's Senior Vice President and Chief Strategy Officer), presented to investors at a Barclays Global Consumer Staples Investors Conference ("Barclays Conference").  *See* Bloomberg, Barclays Global Consumer Staples Conference (Sept. 7, 2016) ("Barclays Global Tr.").

223.    In introducing the TreeHouse representatives at the conference, Andrew Lazar, a research analyst covering TreeHouse for Barclays, stated, in reliance on Defendants' prior public statements, that:

> Today, the company has not only appeared to track ahead of its integration plans, but also work[ed] through some challenges in its legacy portfolio, including stabilizing its single serve coffee business.  Barclays Global Tr. at 1.

224.    Ms. Bishop stated, on behalf of TreeHouse, that the ConAgra Private Brands transaction "brings us additional scale and synergies" and gives TreeHouse "even better partnership capabilities with our customers."  She added that "with the scale that we have, we're able to really get those top-to-top meetings with our top customers and help put together a portfolio of products for them. . . .  [W]e have an even broader . . . portfolio of business. . . . [W]hen we go to customers we're able to put together programs for them across a broad range of technological and product capabilities. . . .  We've got that leverage to bring unique things that most other private label supplies can't bring."  Barclays Global Tr. at 5.

225.    With respect to the Company's financial performance, Ms. Bishop acknowledged that "[o]ne of the risks . . . with an integration is that both teams get so distracted by the knitting together of the companies that you lose the ability to actually run the base business." Accordingly, she stated "priority number one and every team members can recite it, is to make sure that both businesses deliver their 2016 plans."  Barclays Global Tr. at 5.

226.    Defendant Riordan concluded his remarks by stating that:

> {36} I'm really proud that over the last 10 years, we've never had to come to you and say, we've had [an] issue with one of our acquisitions. We've had an integration problem that set us back and we're very confident that won't happen again.  Barclays Global Tr. at 9.

227.    Based on Defendants' statements, on September 7, 2016, after the Barclays Conference analysts at Susquehanna Financial Group, LLP ("Susquehanna"), wrote in an analyst

report that in regard to "the Private Brands integration, the company has a top-level mandate for both the THS legacy and ConAgra Private Brands businesses to deliver on the respective CY16 business plan (as to not lose sight of this during the integration)."

## THE TRUTH EMERGES

A.   **TreeHouse Reveals That the Private Brands Sales Staff Was Ill-Prepared to Achieve Revenue Growth**

228.   Despite TreeHouse's reliance on its reputation integrating prior acquisitions, it was unable to properly integrate Private Brands without a decline in sales.

229.   On November 3, 2016, before the market opened, for the third quarter ended September 30, 2016, TreeHouse reported GAAP earnings per share of $0.65.  Adjusted earnings per share were $0.70, compared to the Wall Street consensus estimate of $0.78 according to J.P. Morgan; and Private Brands net sales were $789 million, compared to $859.4 million in the prior year, an 8.2 percent decline according to an analyst report dated November 4, 2016 by Jefferies. TreeHouse had projected on August 5, 2016, third quarter GAAP and adjusted earnings per share between $0.75 and $0.80 per share.  TreeHouse also lowered its full year adjusted earnings per share forecast to $2.80-$2.85 per share from $3.00-$3.10 per share "due to the combination of lower than expected third quarter sales from the Private Brands Business, along with our belief that fourth quarter Private Brands sales will fall short of our goal to stem its year-over-year sales declines."  Projected adjusted earnings per share for the fourth quarter were accordingly lowered to $1.07 to $1.12 per share.  Defendant Reed commented that the Private Brands business "fell short of expectations for the quarter" because of the Company's "all-encompassing efforts to smoothly integrate the operations of the new business" and "the shift in management attention led to less robust Private Brands sales than we experienced in the legacy organization."

230. Defendant Reed, in commenting on the poor performance of the Private Brands business, stated in relevant part:

> The third quarter was a tale of two cities. Our legacy business continued to perform well, paced by Retail volume/mix growth of 4.6% and 80 basis points of direct operating income margin expansion. On the other hand, while the Private Brands business showed sequential improvement, its results fell short of our expectations for the quarter.
>
> We believe the underperformance of the Private Brands business is attributable to our all-encompassing efforts to smoothly integrate the operations of the new business. While we have made great progress in consolidating plants, stabilizing the workforce and reducing our reliance on the transition services, the shift in management attention led to less robust Private Brands sales than we experienced in the legacy organization. We will be unveiling a new go-to-market sales structure to better align and focus our sales teams to drive new and consistent growth.

231. TreeHouse also issued a second contemporaneous release before the opening of the securities markets on November 3, 2016, revealing that Sliva had resigned as President "to pursue another career opportunity" and that Riordan would delay his retirement (which had been announced on August 4, 2016) and assume the position of acting President.

232. During a conference call with analysts on November 3, 2016, defendant Riordan disclosed that TreeHouse was "too focused on the internal integration program and not focused enough on our go-to market activities," and as a result "experienced sales challenges that we believe are the result of not having enough attention on programs and merchandising that could have and should have generated incremental sales opportunities at existing accounts." Thomson Reuters, Q3 2016 Earnings Call (Nov. 3, 2016) ("Q3 2016 Tr.") at 6.

233. Reed added on the conference call:

> I also have further analysis of our recent performance and current outlook, specifically. The shortfalls in Q3 earnings and Q4 outlook are principally attributable to a miscalculation on our behalf regarding the internal issues, not market conditions or organizational capability. We had underestimated the heavy burden that the acquired Private Brands team would bear under the combined

55

weight of the TSA, IT conversion, integration, operating Company reorganization and ConAgra's dissolution.

Simply put, we inadvertently overloaded the newly acquired team with an administrative workload that interfered with their day jobs and distanced them from the private label marketplace. The effect of this miscalculation can best be seen in the dichotomy between the legendary TreeHouse and acquired Private Brands top lines in the third quarter.

\*       \*       \*

While there were various category and customer puts and calls in play, our team's assessment is that our current performance reflects, to a large extent, a self-inflicted wound. We plan to reorganize our several operating companies into a single united customer facing approach, realigning our teams from their present sales channel orientation to a product category basis.  Five divisions: baked goods, beverages, condiments, meals and snacks, will be formed as frontline business units, each engaging our customers across all channels with a market basket of closely related products sold in the same aisle rather than the entire TreeHouse cornucopia. . . .  [T]his realignment will both increase our go-to-market focus as well as improve our operational performance. Q3 2016 Tr. at 3-4.

234.    Defendant Riordan and Rachel Bishop gave a different explanation than Reed for the failure of the Private Brands sales staff during the third quarter.  Neither Riordan nor Bishop sought to explain the sales shortfall on the Private Brands' sales force's administrative responsibilities.  Rather, Riordan and Bishop acknowledged on the November 3, 2016, conference call that Defendants recognized early in 2016 that operating TreeHouse and Private Brands as independent businesses was "challenging" and that TreeHouse began a process in July 2016 (first with respect to the condiments business) of establishing a "dedicated sales force of experts in their category."  Q3 2016 Tr. at 5.  However, the 93% of Private Brands' business that was not condiments remained without a "dedicated sales force of experts."

235.    Specifically, Bishop stated:

[O]ur approach has been to maintain separation between the Private Brands and the legacy TreeHouse operating companies, while we bring together the support functions and learn the intricacies of the business. ...

56

However, this idea of parallel businesses has been challenging for our sales team as they bridge the different processes and business units to present a united front to our customers. That impact is being seen in our top-line shortfall of the Private Brands business and felt by our teams. To address this, we have designed our operating and go-to-market structure for 2017 to give our teams the alignment they need to sell more effectively. In this structure, each division will have a dedicated sales force of experts in their category, able to bring deep category expertise and the advantage of the full TreeHouse scale to our customers. This vision has already been tested and proven by our condiments team, who was the first to be integrated in July.  Q3 2016 Tr. at 5.

*     *     *

And when we start to add more complex processes behind the scenes to help bring those organizations together and provide a unified front to the customers, that's really where we stumbled a little bit and some of the dialog, some of the consistency was lost there.  Q3 2016 Tr. at 13.

*     *     *

[W]e haven't lost major customers in categories. It has been purely losing promotional programs potentially to branded customers. So that's where we are seeing the challenges. And if I look at a sales person and how they are working today, when we brought the businesses together, a single sales person now has more systems that they need to pull information from in order to bring the right facts and information to the customer. And in effect what happened is they spent more time in front of their screen getting all the pieces of information together and a little bit less time with their customer.  Q3 2016 Tr. at 15.

236.     As Riordan acknowledged on an investor conference call on February 9, 2017,

***"[w]e knew our very quick growth had made it just too difficult for our customer-oriented***

***teams to fully understand the 32 product categories we sell."***  Thomson Reuters, Q4 2016

Earnings Call (Feb. 9, 2017) ("Q4 2016 Tr.") at 4.  Riordan added that "[w]e have said it before

and I'll say it again now, we have too many SKUs relative to the number of products we made

and the customers we service."  Q4 2016 Tr. at 5.

237.     Defendant Riordan stated on the November 3 call that "we are in the process of

organizing our business into five key divisions that will become effective in the first quarter of

2017."  Sales representatives would "be trained to represent just the products of their teams,

rather than trying to learn all the nuances of our 26 product categories" Q3 2016 Tr. at 6:

57

[W]e've seen the challenges that you have trying to effectively sell 26 product categories. And getting it down to a handful not only gives you better expertise, but frankly puts you more in line with our private label competitors who tend to sell one or two product categories only. So we think this is absolutely the way to energize our sales and hopefully get back to a growth mode and surpass our expectations. Q3 2016 Tr. at 14.

238.    Riordan also acknowledged that TreeHouse had recognized the limitations of its

prior sales organization and made the switch in organization with respect to the condiments

business in July 2016:

the question is how can we be so sure this new structure will solve the issue. The best proof is looking at our Private Brands condiments business. Rachel talked about how the July integration has allowed the condiments team to leverage their shared capabilities. Let me give you a sense for how that translates into top line growth. Heading into July, the Private Brands condiments volumes were down 14.6% at the end of Q1 and down 14.8% in Q2. Effective with the July integration, our July, August and September volumes of the Private Brands condiments categories were down 22.2%, down 14.2% and then plus 0.5% respectively, and the just-finished month of October was up 2.5%. While the opening month was tough, we are clearly seeing improving trends in the integrated business. I think this demonstrates how narrowing the focus for our go-to-market teams can fairly quickly energize our sales execution. Q3 2016 Tr. at 6.

239.    Riordan acknowledged however that Defendants' prior statements that the

benefits of sales integration would be achieved in the third quarter (*see* ¶¶ 217-218) were

misleading because the integration of the condiments sales staff in July 2016 came too late to

benefit the third quarter, and the balance of the Private Brands sales staff lacked expertise.

240.    Furthermore, the proposal to align the sales teams into "five divisions" based on

product categories to solve the problem was nothing new. The Company knew of this potential

problem for years, and Reed used almost identical language in his discussion with analysts on

August 6, 2015:

Go-to-market functions will be consolidated under our three current SEC segments organized by channel distribution. Category-based business units will be grouped into four consumer product-based divisions: beverages, condiments, meals and snacks. Q2 2015 Tr. at 7.

58

241. On the November 3, 2016, conference call, Reed refused to answer directly the question by David Driscoll (the research analyst from Citigroup), where "is there a connection here between the Private Brands issues and the departures of Chris [Sliva]." Reed in response, stated only "I'd say they are coincident of course," but otherwise failed to respond to the question, leaving the impression that the abrupt departure of Sliva who was responsible for the operations of both Flagstone and Private Brands, just three months after a major promotion, was in fact not a coincidence—something not lost on market analysts. 3Q 2016 Tr. at 9-10.

242. The full question and answer between Driscoll and Reed concerning Sliva, saw Reed admitting that TreeHouse had had been overburdened with the integration issues:

> Q.    Driscoll:  [I]s there a connection here between the Private Brands issues and the departure of Chris?
>
> A.    Reed:  David, this is Sam. I'd say they are coincident of course. And the plan that we'll implement over the next remainder of this year was one that our entire team developed and Chris was a major part of that and we all set out. As I had indicated in my words, this was a miscalculation about the combined burden, not just of the integration, but the combined burden of the TSA, IT, other administrative matters that we put on this group. They displayed extraordinary energy at the very beginning, almost a sense of relief. But then when we got into the particulars, it was the accumulative factor of all of those matters. And again, that was our decision as a team. 3Q 2016 Tr. at 9.

243. Similarly, Riordan dodged the question from Driscoll of why the Private Brands shortfall in the third quarter was not readily apparent to TreeHouse management when they provided such reassuring presentations on September 7, 2016, at the Barclays Global Conference (barely three weeks away from the end of the third quarter): "[B]ack on early September, you guys presented at a conference and it seemed to be pretty positive and optimistic and then today, we have a different outcome." 3Q 2016 Tr. at 10.

244. Rather, Riordan responded with a non sequitur with respect to the fourth quarter by saying that a "third of [Private Brand's] annual sales take place in the fourth quarter . . . so it's

so back end loaded naturally due to the holiday season." Riordan moreover acknowledged that TreeHouse "track [Private Brand's sales] day-to-day." 3Q 2016 Tr. at 10. Although Reed explained that weaker than anticipated fourth quarter and holiday sales were not evident until early October 2016 ("it didn't become as evident that we would have the challenge until really September results became clear"), he failed to explain the basis for his and TreeHouse's belief as late as August 4, 2016, and September 7, 2016, that TreeHouse would achieve adjusted earnings between $0.75 and $0.80 a share for the third quarter, and failed to acknowledge the level of strain and lack of expertise of the Private Brands sales staff.

245.    The complete question and answer between Driscoll and Riordan concerning third quarter sales is as follows:

Q.    Driscoll:  [S]o back on early September, you guys presented at a conference and it seemed to be pretty positive and optimistic, and then today, we have such a different outcome. Was it that you just don't have the SAP systems in place to have known where the Private Brands sales trends were? Or did September get particularly worse and the failure to have the right promotions did it really hit the September month?

A.    Riordan:  David, it's true that September did not materialize when we thought it would.  And as we enter into the fourth quarter now which is close to a third of their annual sales take place in the fourth quarter for Private Brands, it's so back-end loaded naturally due to the holiday season and their products that it didn't become as evident that we would have the challenge until really the September results became clear. And as you know, even though we tracked day-to-day, you don't really get a good handle on how the month is going to go till the very end of the month, and that's what really caused us to change our mind. So when we all met at the end of August and September, it wasn't evident at that time.  3Q 2016 Tr. at 10.

246.    Reed subsequently acknowledged that backlog is a significant part of TreeHouse's business and that orders are customarily placed for promotions at least one quarter in advance.  ("A lot of that fourth quarter volume is decided early in the third quarter with regard to orders, particularly in the most seasonable businesses.  And while we've seen pick up there in

the legacy categories, we have not seen the same responsiveness.  So that's why we've brought the entire forecast back") *See* 3Q 2016 Tr. at 12 (promotions "require[] months of prior planning with your customers").

247.     Immediately, analysts reacted to the integration and sales difficulties.  For example, on November 3, 2016, BMO Capital Markets commented in a report that TreeHouse's significant third quarter earnings miss and lowering of the fourth quarter guidance "clearly brings into focus the underlying risks associated with the integration of the Private Brands Business."  Credit Suisse noted that the earnings miss "was driven by a sales shortfall in the Private Brands business."

248.     Analyst David Driscoll at Citi commented in an analyst report dated November 3, 2016, that the "weaker than expected sales in the acquired Private Brands business" were "due to lost promotional activity in the grocery, while its sales force was distracted by the integration" and "poor execution on the part of the THS sales force, which has clearly hit a rough patch in the early part of the Private Brands integration."  In a second analyst report on November 3, 2016, Driscoll noted that the "TreeHouse story looks to be a bit of a mess."  Significantly Driscoll pointed out, "[a]t a recent conference, management suggested things were ok on [Private Brands], but now it looks like the situation is quite a bit worse."

249.     Analysts at William Blair commented in a November 3, 2016 analyst report that the Private Brands failed to meet sales expectations was due to "time and resource commitments required to internally support operation integration milestones" which "limited the private brand organization's ability to focus on sales initiatives and retail execution."  Significantly, the failure of Private Brands was "self-inflicted as opposed to market or category driven."

250.    On November 3, 2016, Credit Suisse analyst Robert Moskaw reduced his price target from $100 to $78 a share, stating that "we don't feel comfortable recommending it until we get a deeper understanding into the health problems facing the acquired Private Brands business, the path toward cost synergies, and the reasons behind the abrupt departure of the Company's COO Chris Sliva."

251.    Jefferies analyst Akshay Jagdale echoed in a November 3, 2016, report that Sliva's resignation so soon after Riordan's announced retirement "are a concern."

252.    J.P. Morgan analyst Joshua A. Levine also registered in a November 3, 2016, research report, that he was "particularly surprised by the resignation of Chris Sliva," so soon after Reed had represented that "it is under Chris' tutelage that we are designing an organization structure to deliver on the transformative potential of the TreeHouse promise to our customers."

253.    Analysts at SunTrust Robinson Humphrey were "disturbed by the departure of Chris Sliva" as he "quickly moved up through the ranks since he joined the company six years ago and was basically the #2 person at the company."  SunTrust viewed Sliva and Riordan as the two people most "responsible for making the Private Brands deal" and now they "are no longer in their operational roles and cracks in the deal are already starting to appear."

254.    KeyBanc analyst Brett Andress described Chris Sliva's resignation as "unsettling" in his November 3, 2016, research report, adding that it "inject[ed] added uncertainty into the integration thesis."  Andress stated that it was also "hard to defend the optics and credibility of the management moves over the last two qtrs. . . ."

255.    On November 3, 2016, *The Wall Street Journal* published an article detailing the concerns regarding the Company's performance. According to the article:

> The exit of Mr. Sliva and the pending retirement of Mr. Riordan are troubling
> signs, said William Chappell Jr., an analyst for SunTrust Robinson Humphrey.

"In our opinion, two of the people most responsible for making the private brands deal are no longer in their operational roles, and cracks in the deal are already starting to appear," Mr. Chappell said in a note to clients. "We still believe in the long terms potential for the deal but now believe the stock is dead money, at best, until mid-2017."

256. On the Company's revelations, the Company's shares fell $16.87 per share, or nearly 20 percent, to close at $69.72 per share on November 3, 2016. The negative return on the shares was statistically significant at the 95% confidence level.

257. On November 3, 2016, after the close of the market, TreeHouse filed a quarterly report for the period ended September 30, 2016, on a Form 10-Q ("third quarter 2016 Form 10-Q") with the SEC, which was signed by defendant Riordan. Defendants disclosed it in the Form 10-Q that whereas "[t]he estimated value of the . . . Flagstone reporting unit exceeded its carrying value by approximately 10% as of December 31, 2015," "the reporting unit has not achieved the forecasted results for the nine months ended September 30, 2016," and "[i]f the reporting unit does not achieve forecasted results in future periods, the estimated fair value of the reporting unit could decline, which may result in a material impairment in a subsequent period":

the reporting unit (with allocated goodwill of $511.3 million) may not pass step one of future goodwill impairment analyses. The Company's annual impairment analyses have assumed increasing cash flows over the next several years, based on anticipated sales growth and improved profitability. Although the reporting unit has not achieved the forecasted results for the nine months ended September 30, 2016, the Company's long-term outlook remains consistent with the previous forecast. If the reporting unit does not achieve forecasted results in future periods or if other key assumptions change, the estimated fair value of the reporting unit could decline, which may result in a material impairment in a subsequent period.

258. Thus, notwithstanding Defendants' statements that the third quarter shortfall in operations was derived entirely from a failure of performance of Private Brands, the facts establish that the short fall derived in part from the failure of performance of Flagstone to "achieve forecasted results for the nine months ended September 30, 2016"—owning to its own

integration difficulties described above (suppressed ahead of the Private Brands acquisition and the capital raises by TreeHouse necessary to achieve it).

259.     Wells Fargo research analyst (John Baumgartner) wrote in an analyst report dated November 4, 2016 that it had a meeting with management in September 2016 where it was "particularly pleased with the company's laser-like focus on integration and managing the business to significantly limit any such risk."  Accordingly, as Baumgartner stated in his research report, it was "a major surprise to us that TreeHouse would allow the dynamic to repeat with employees becoming too removed from day-to-day selling in order to execute integration efforts" given that there was "a lack of dedication and focus in the selling effort was one of the major downfalls that impacted ConAgra with these assets initially."

260.     Baumgartner added that the lack of attentiveness to sales was "particularly frustrating to us given that THS was aware that a lack of focus played significantly into the initial derailment under ConAgra's Ownership."  These comments in full read:

> Management perceives the revenue shortfalls to be a result of "internal miscalculations" in that the new team has been overloaded with administrative work and which has interfered with their selling efforts. In some cases, such as snacks, ***salespeople were required to pull data from various systems to combine orders from Flagstone and the Private Brands books because systems had yet to be integrated***. Further, it's believed that insufficient focus has been placed on the merchandising programs capable of driving incremental sales and particularly given that the Private Brands seasonality skews to the holidays.  Employees are in the midst of navigating IT conversions, transition services work, integration, and company reorganization. Most of the shortfall was observed in cookies/crackers and ready-to-eat cereal; areas requiring significant attention to promotion and merchandising.

261.     On November 4, 2016, BMO Capital Markets ("BMO") noted in an analyst report that "Private Brands' volumes declined 3.1% as challenges stemming from the integration process lead to a top-line shortfall that affected all three reporting segments."  Significantly, BMO noted that "the company admitted to underestimating the burden that the integration

64

process would play on the day-to-day roles of employees." As a result of "the complexity of integration," TreeHouse's salesforce spent "less time in the field and more time grappling with new systems, yielding sluggish top-line growth in the quarter."

262. On November 4, 2016, analysts at Susquehanna emphasized in an analyst report that the earnings shortfall in the third quarter "was related to lower than expected sales for the" Private Brands, due to several factors, including the following:

> Mainly the result of a self-inflicted wound, according to management.
>
> Attributable to a miscalculation on [sic] regarding internal issues, not market conditions or organizational capability.
>
> During the integration process the approach was to maintain separation between the Private Brands and the legacy THS operating companies, while the support functions are brought together. But the idea of parallel businesses has been challenging for the sales team and they bridge the different processes and business units to present a united front to customers.

263. Farha Aslam, an analyst at Stephens reduced its rating on the stock to Equal-Weight from Overweight and reduced her price target from $115 to $78 a share. The Stephens research report stated that "[t]he exodus of senior management talent post the largest acquisition in the Company's history is troubling."

264. After TreeHouse hosted an Investor Day on November 14, 2016, Stephens wrote an analyst report on November 15, 2016, stating that the "Private Brands business's revenues are running $200 million – $300 million behind expectations, so the annual sales run rate in F2016 will likely be about $3.0 billion." Stephens also noted that "TreeHouse has restructured the sales force so that the Company's go to market capabilities better support key customers without overloading the sales force with too many business lines" as "[m]anagement has noted that much of the F2H16 top-line miss has been driven by poor sales execution given too much focus on

integration efforts at the expense of customer focus."  It will be organized "into 5 key business divisions with more of a product line focus rather than a customer orientation."

265.    On November 15, 2016, Susquehanna issued another analyst report stating that Private Brands has "meaningfully lagged the THS legacy categories" due "to 'integration distraction' issues rather than to structural issues with CAG PL categories and business."

266.    On November 15, 2016, the JP Morgan analyst (Levine) published a report stating that management had acknowledged yesterday (November 14, 2016) that after "~9 months [i.e., from the February 1, 2016, Private Brands acquisition through October 2016] of instability and internal concerns about what to sell and whether or not one might stay with the company, the sales team now has clear sales goals within the newly introduced category framework."

267.    Similarly, the Barclays analyst (Andrew Lazar) stated in his November 15, 2016, research report, that "[w]e believe until fairly recently there was still a tremendous lack of clarity within the sales organization regarding new roles—which could well have been the main reason for the recent sales weakness in Private Brands sales relative to THS's expectations."

268.    Although condiments improved sales in August and September 2016, according to Levine at JP Morgan, in his November 15, 2016, research report based on communications with Condiments Division President Michael Alford, that "was due, in part, to the fact that the condiments portfolios at both legacy THS and Private Brands were generally similar.  This might not necessarily be the case in certain other segments."  Levine added that "we think [that only] some of [Private Brands'] businesses (meals, baked goods, et al.) are already on the existing ERP system—even if it is not THS's SAP system."

66

269. Also on November 15, 2016, in an analyst report, Wells Fargo emphasized that the integration problem "should have been avoidable given management's prior understanding of what went wrong under ConAgra's ownership."

270. On December 2, 2016, an article in Crain's Chicago Business entitled "Why TreeHouse Investors Are So Mad" stated the following:

> Sam Reed, the deal-maker who built TreeHouse Foods into the country's biggest supplier of private-label packaged foods, is having trouble digesting his latest acquisition.
>
> The $2.7 billion purchase of ConAgra Foods' private-brands business in February was the largest of more than a dozen deals Reed has closed since TreeHouse was spun out of Dean Foods in 2005. It looked like a bargain: TreeHouse paid $4 billion less than ConAgra shelled out to acquire the business only three years earlier.
>
> On second thought, the markdown might have been a bad sign. Stubborn sales declines at private brands marred TreeHouse's third-quarter results, which fell short of Wall Street's expectations and forced the company to trim full-year financial projections. If that weren't enough of a shock for investors used to stellar results from TreeHouse, they also learned of upheaval in the executive suite. President Christopher Sliva left and was replaced on an interim basis by CFO Dennis Riordan, who had been planning to retire.
>
> The double dose of downbeat news sent TreeHouse stock down 22 percent on Nov. 3, *its biggest daily drop since 2005*.
>
> CEO Reed now faces his most serious setback in an 11 -year growth spree that lifted TreeHouse's annual revenue to $7 billion from S700 million. *He bet heavily on the ConAgra business*, which now represents more than half of TreeHouse's sales. To finance the acquisition, the Oak Brook company borrowed $1.8 billion and issued $862.5 million worth of new stock.
>
> So far the deal has brought nothing but pain. TreeHouse's operating profit margin shrank to 4.9 percent in the third quarter from 7.8 percent a year earlier. Acquisition financing pushed its debt ratio well above the industry average while diluting the stakes of investors who held TreeHouse stock before the deal. After nearly doubling in a five-year climb that peaked July 11, the stock has since lost 33 percent of its value, to $67.05 yesterday.

**B.**     **TreeHouse Takes a $333.4 Million Write-Down of Flagstone Goodwill**

271.     Subsequently, on February 9, 2017, TreeHouse stated in a press release that

TreeHouse was required to take a $333.4 million (or 65.2%) charge against the $511.3 million of

goodwill that had been carried on TreeHouse's balance sheet.  TreeHouse stated:

> The Company recorded a non-cash charge of $333.4 million related to impairment
> of goodwill and other intangible assets primarily associated with the North
> American Retail Grocery – Flagstone ("Retail Flagstone") reporting unit. . .  In
> two full years since acquisition, this business has experienced unforeseen
> challenges including, but not limited to, pricing declines from competitive
> pressure, unfavorable almond commodity costs, cashew supplier issues, and costs
> associated with the sunflower seed recall.  These challenges led to lower than
> originally planned results in this unit in the past.

272.     Matthew Foulston, TreeHouse's new CFO, stated on a February 9, 2017,

conference call that the impairment of Flagstone's goodwill began early in TreeHouse's

ownership of the company:

> Those of you that have been around longer that I will remember that we had high
> expectations when we purchased the Flagstone snack nuts, trail mix, and dried
> fruit business back in August of 2014.

> At the time, the business had a track record of double-digit growth and we
> expected Flagstone to continue in its growth trajectory and deliver $750 million in
> annual revenue, albeit with thinner margins than our corporate average given the
> input costs structure of the nut business.

> Since that time, Flagstone's performance has not delivered as we originally
> hoped. Sequentially the snack nuts category has endured a series of headwinds
> over the course of the last two years.  If you recall, the category endured dramatic
> almond input cost increases in 2014 as a result of the California drought
> conditions. Cost increases passed through to our consumers created an imbalance
> in retail pricing for snack nuts which resulted in volume declines and decreased
> promotion and display.  While the category has recovered from the drought
> impact, in 2016 the sunflower seed recall created further challenges. We noted the
> risk of potential impairment in our third-quarter 10-Q, consistent with SEC
> requirements.  ***Flagstone's shortfalls early in our ownership have weighed
> heavily on our discounted cash flow model, which in turn drives a goodwill
> analysis.***

273.     On footnote 8 of the 2016 Form 10-K, at page 77, the company added that:

Upon completion of the annual goodwill impairment analysis as of December 31, 2016, the Company recorded impairment losses of $333.4 million . . . related to the North American Retail Grocery – Flagstone unit[ ]. . . . Th[is] reporting unit [ ] did not achieve the forecasted results for the year ended December 31, 2016, resulting in reduced future revenue and profitability expectations. The primary factor impacting the future revenue and profitability expectations for the North American Retail Grocery – Flagstone reporting unit was competitive pressures . . . . Th[is] change[ ] in expectations and the related reductions in discounted future cash flows resulted in book values that exceeded the fair values for these reporting units, which required the recognition of impairment losses.

274. The magnitude and description of the need for the Flagstone write-off in itself is sufficient to establish that the deterioration of the business was a long-term problem that had been concealed from the investing public, as described above, and was not only the result of reduced performance in the third and fourth quarters.

## DEFENDANTS' PUBLIC STATEMENTS WERE STATEMENTS OF EXISTING FACTS THAT WERE MATERIALLY FALSE AND MISLEADING AT THE TIME MADE

275. Defendants' public statements of existing fact were materially false and misleading at the time made. Defendants also failed to disclose material facts necessary to make the statements made not materially false and misleading in the context in which they were made.

### A. Defendants Misrepresented and Failed to Disclose Material Facts Concerning Flagstone's Operations and Goodwill Impairment

276. Defendants' statements during the Class Period concerning Flagstone were materially false and misleading.

277. Defendants' statements during the Class Period that TreeHouse had a "successful track record" and "proven acquisition capabilities" were statements of existing fact that were materially false and misleading at the time. *See* False Statement No. 1 (¶ 138).

278. False Statement Nos. 2-7, 10-14, 21-23, 25, 33-36 contain similar representations of existing fact with respect to the success of the Flagstone acquisition and the appropriate

accounting for $511.3 million of Flagstone goodwill. *See, e.g.,* False Statement No. 2 (¶ 139; "[S]enior management has demonstrated its ability to grow our business . . . through . . . several complementary acquisitions.").

279.    At the time those statements were made each of the defendants had actual knowledge and failed to disclose that the $864 million Flagstone acquisition was not "successful" and did not evidence "proven acquisition capabilities." ¶138. Rather, TreeHouse failed to integrate Flagstone onto TreeHouse's SAP system or otherwise integrate Flagstone into TreeHouse's operations and from inception, Flagstone failed to generate operating cash flow sufficient to justify the $864 million purchase cost or $511.3 million in goodwill from the Flagstone acquisition that TreeHouse maintained on its balance sheet. *See* ¶ 271. Flagstone was by far the largest acquisition by TreeHouse prior to the Private Brands acquisition.

280.    To the extent any of the false statements were statements of belief, at the time made defendants' failed to disclose meaningful qualifications on the statements with respect to the adverse integration and performance of Flagstone.

281.    TreeHouse had been unable or unwilling to integrate Flagstone and the valuation of the $511.3 million in goodwill was based on aggressive projections that Flagstone was not able to maintain. *See, e.g.*, ¶ 272[6]. At all relevant times there existed a material, undisclosed risk that TreeHouse would be required to take a goodwill impairment charge related to Flagstone.

282.    From July 2014 through December 2015, and continuing throughout the Class Period, Flagstone substantially underperformed projections both with respect to net sales and

---

[6] *See, e.g.*, Form 8-K dated February 9, 2017:  "In two full years since acquisition, this business has experienced unforeseen challenges including, but not limited to, pricing declines from competitive pressure, unfavorable almond commodity costs, cashew supplier issues, and costs associated with the sunflower seed recall.  These challenges led to lower than originally planned results in this unit in the past."

earnings. Accordingly, Defendants should have either written down Flagstone's goodwill or advised investors of the material risk of a write-down.

283. In fact, Defendants' repetitious representations that TreeHouse had successfully completed the integration of many businesses over ten years, and had grown its revenue tenfold, was nothing more than a fiction to aggrandize the Defendants, misleading the market into believing that the Flagstone integration was proceeding smoothly, when it decidedly was not.

284. The reporting and disclosures with respect to goodwill, subsequent to its initial recognition, in financial statements that are prepared in accordance with generally accepted accounting principles ("GAAP") must be accounted for in accordance with Accounting Standards Codification ("ASC") 350-20, *Goodwill*.

285. ASC 350-20 requires that "[g]oodwill of a reporting unit shall be tested for impairment on an annual basis." ASC 350-20-35-28. Furthermore, ASC 350-20 states that, for an entity or reporting unit, goodwill "shall be tested for impairment if an event occurs or circumstances change that indicate that the fair value of the entity (or the reporting unit) may be below its carrying amount (a triggering event)." ASC 350-20-35-66.

286. ASC 350-20-35-3C provides examples of circumstances and/or events that could result in the goodwill of an entity or a reporting unit to be impaired. These circumstances and/or events include, but are not limited to, the following:

- Macroeconomic conditions such as a deterioration in general economic conditions, limitations on accessing capital, fluctuations in foreign exchange rates, or other developments in equity and credit markets
- Industry and market considerations such as a deterioration in the environment in which an entity operates, *an increased competitive environment*, a decline in market dependent multiples or metrics . . . , a change in the market for an entity's products or services, or a regulatory or political development
- ***Cost factors such as increases in raw materials, labor, or other costs that have a negative effect on earnings and cash flows***

71

- ***Overall financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods***
- Other relevant entity specific events such as changes in management, key personnel, strategy, or customers; contemplation of bankruptcy; or litigation

ASC 350-20-35-3C.

287. GAAP, in ASC 450, "Contingencies" ("ASC 450"), defines a loss contingency as a situation involving uncertainty as to a possible loss to an entity that will be resolved when one or more future events occur or fail to occur. (ASC 450-20-20). For loss contingencies that are considered "reasonably possible," a term used to describe the likelihood that future events will confirm the loss contingency is greater than "remote" (slight) but less than "probable" (likely), GAAP requires that the nature of the loss contingency as well as an estimate of the amount, or range of loss or a statement that such an estimate cannot be made, with respect to the loss contingency be disclosed in an entity's financial statements. ASC 450-20-50-3 & 4.

288. During the Class Period, TreeHouse purported to assess, on an annual basis, the carrying value of goodwill for its reporting units using a two-step impairment test in accordance with ASC 350-20. The general idea of the goodwill impairment test is to determine whether the carrying value of the entity or reporting unit is consistent with its fair value as of the measurement date. GAAP defines fair value as the amount at which an asset would be sold, or a liability transferred, in an orderly transaction between market participants at the measurement date. ASC 820-10-20. If the goodwill impairment test yields a result in which the carrying value of an entity or reporting unit exceeds the fair value of its goodwill as of the measurement date, GAAP requires that "an impairment loss shall be recognized in amount equal to that excess." ASC 350-20-35-11.

289.     If, as of December 31, 2015, TreeHouse had measured Flagstone's fair value which reflected assumptions that would be used in an orderly transaction between market participants as required by GAAP, it would have either reported goodwill impairment for the Flagstone reporting unit, or disclosed that it was reasonably possible that Flagstone's goodwill impairment could be recognized in the near future if it continued to underperform its cash flow forecasts.  Instead, TreeHouse did not disclose that Flagstone's goodwill could be impaired in the near future until it issued its third quarter 2016 financial statements on November 3, 2016, and did not record a goodwill impairment loss until the 2016 10-K was issued on February 16, 2017.

290.     Among other things, because of almond pricing, Flagstone had substantially under-performed net sales projections.  TreeHouse had projected 2015 net sales of $750 million for Flagstone, but actual 2015 net sales were reported at $658 million.  Although TreeHouse did not separately break out Flagstone's profitability in 2015, the facts strongly suggest that Private Brands also substantially under-achieved anticipation earnings accretion of $0.24 to $0.28 a TreeHouse share.  Although TreeHouse accurately reported Flagstone revenue performance, it failed to disclose the extent to which goodwill was impaired.

291.     Among the facts that establish that Flagstone's goodwill was either impaired, or could reasonably possibly be impaired in the near-term and therefore required a disclosure of such, at year-end 2015, are:

a.     In its Form 10-Q for the third quarter 2016, the Company stated that its annual goodwill impairment analysis, most recently performed as of December 31, 2015, assumed that cash flows would continue to increase over several years. This critical assumption used to estimate the fair value of the Flagstone reporting unit in its goodwill impairment analysis was inconsistent with management's knowledge that Flagstone

73

failed to meet its projections soon after it was acquired by the Company on July 29, 2014. Specifically, the Company disclosed that as a result of drought conditions in California during 2014, the principal market in which almonds are grown, the cost of almonds and other raw materials skyrocketed. Although TreeHouse sought to pass the cost of raw materials onto consumers of its Flagstone private brand products, the increased retail prices caused a substantial decline in demand for Flagstone products, and TreeHouse's sales of those products plummeted. In fact, Flagstone's net sales in 2015 were $92 million below projections of $750 million.

b.      CFO Foulston acknowledged on February 9, 2017 that the goodwill impairment taken at year-end 2016 was primarily the result of "Flagstone's shortfalls early in our ownership": "[s]ince [its acquisition in August 2014], Flagstone's performance has not delivered as we originally hoped. . . . Flagstone's shortfalls early in our ownership have weighed heavily on our discounted cash flow model, which in turn drives a goodwill analysis." Q4 2016 Tr. at 6.

c.      Defendants had minimized in their public statements the impact on Flagstone from the 2016 sunflower seed recall. *See* ¶¶ 166, 167. In fact, Defendants made public statements suggesting that Flagstone operated profitably and in line with expectations during 2016 (*see* ¶ 214). Thus, Defendants acknowledged that the potential goodwill impairment that was referenced in the third quarter 2016 Form 10-Q and the actual $352.3 million impairment that was revealed at year-end, was attributable to market conditions as of year-end 2015 and not events subsequent to 2015 year-end.

292.    As previously discussed, the factors that led to Flagstone's massive $333.4 million goodwill impairment loss in 2016—which amounted to approximately 65% of

Flagstone's recorded goodwill—did not occur in one year, but was present as of December 31, 2015. The magnitude of the impairment charge as well as the reasons for it support a strong inference of scienter.

293. As explained in detail above, these statements were materially false and misleading and omitted material facts because they failed to state the true condition of the Company, including the lower than anticipated Flagstone cash flow. These statements were also false and misleading because the Company stated that *if* its projected discounted cash flows do not exceed the carrying value of their net assets, the Company ***may*** be required to record additional write-downs to the carrying value of goodwill and intangible assets, when, in fact, by year-end 2015, Flagstone had already experienced "unforeseen challenges" that had "led to lower than originally planned results in this unit in the past." *See also* Q4 2016 Tr. at 6 ("Flagstone's shortfalls early in our ownership have weighed heavily on our discounted cash flow model, which in turn drives a goodwill analysis."). Finally, the Company stated that it ***may*** determine that its "expectations of future financial results and cash flows . . . has decreased . . . which could result in a review of [the] goodwill and intangible assets." This statement was materially misleading because, based on the statements on the February 9, 2017, conference call and in the 2016 Form 10-K, the forecasts had already decreased so significantly that Flagstone should have performed an early impairment analysis of both its goodwill and intangible assets. Alternatively, the Company had performed an impairment review but failed to report it. Clearly the circumstances warranted a review, as evidenced by the $333.4 million impairment charge taken in December 2016.

294. Flagstone's failure to achieve projections necessary to the valuation of goodwill was a "known trend and uncertainty" that TreeHouse was required to disclose pursuant to SEC

75

Regulation 303. *See* 17 CFR 229.303(a)(3)(ii) ("Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.").

295.    Defendants' valuation and disclosure of Flagstone goodwill was a material fact because (i) the $511.3 valuation of the goodwill and statement in the Form 10-K that the discounted cash flow from the goodwill had a value at least 10% above the book value of the goodwill (¶ 257) was an actual or implied representation concerning the current value of the Flagstone business and the anticipated cash flow from that business necessary to value the goodwill, and (ii) a representation that TreeHouse and the Individual Defendants had the ability to value, acquire, consolidate and operate third-party companies.

296.    If Defendants had disclosed the truth about the difficulties experienced with the Flagstone acquisition and the Flagstone goodwill impairment in a timely manner (prior to or at the beginning of the Class Period), investors would have had a different perception of the acumen of the Individual Defendants and TreeHouse management and been unwilling to pay the same prices for TreeHouse common stock as they did.  The market would have reacted negatively and Defendants would have been deterred from the subsequent Private Brands acquisition or such acquisition would have been more costly.

**B.**    **Defendants Misrepresented and Failed to Disclose The Problems At Private Brands**

297.    Defendants' statements about the progress TreeHouse had made commencing on January 20, 2016, in integrating the Private Brands business, were materially false and misleading in that Defendants' knew that the Private Brands sales staff was spread-thin over 26 or more products and were not experts on the products they were selling.  Moreover, the Private

76

Brands sales staff was distracted by integration obligations and otherwise ineffective through the first three quarters of 2016. *See* False Statement Nos. 8-9, 13-36.

298.    In fact, it was only after TreeHouse legacy and Private Brands condiments were integrated and the sales function reorganized in July 2016 that some synergies in that product-line, which constituted only 7% of the Private Brands acquisition, began to be realized. Defendants knew, due to the failure to integrate TreeHouse legacy and Private Brands operations for the remaining 93% of the Private Brands acquisition, that third quarter 2016 sales almost certainly would not meet Defendants' projections. Defendants were aware of these issues even before the Private Brands acquisition because they had encountered them before in connection with the earlier Flagstone acquisition since defendant Reed proposed a similar reorganization after the second quarter of 2015 on the August 6, 2015, conference call.

299.    Defendants' false statements concerning the integration of the Private Brands sales force were the premise for analyst's third quarter earnings estimates of $0.78 per share.

300.    Moreover, in announcing third quarter sales, Defendants stated that the sales staff failed to secure promotional sales.

301.    Historically, Defendants' represented that promotions are committed customarily three months in advance and that quarterly projections were based on existing orders and already committed promotions. *See, e.g.*, ¶¶ 148-149, 244-245.

302.    Thus, when Defendants made statements as late as August 4, 2016, and September 7, 2016, concerning third quarter sales, customers would have already committed to promotions.

303.    The difficulty and delay in sourcing ingredients would make it difficult to fulfill orders not already in house early in a quarter. *See, e.g.*, ¶107.

304.     Each of the Defendants' statements during the Class Period that the integration of Private Brands into TreeHouse would not had an adverse impact on sales (e.g., False Statement Nos. 8, 15, 16) were materially false and misleading.  Thus, Reed had stated, for example, on the February 11, 2016, conference call (False Statement No. 8; ¶ 145) that TreeHouse's operating company had been aligned "into four consumer-based categories" and that "early indications point to" a similar Private Brands "integration process."  In fact, Private Brands' sales efforts failed because:

a.     Private Brands sales people were expected to sell in 32 product categories. Defendants "knew our very quick growth had made it just too difficult for our customer-oriented teams to fully understand the 32 product categories we sell."  (¶ 236); *see also* ¶ 237 ("[W]e've seen the challenges that you have trying to effectively sell 26 product categories.").

b.     The Private Brands sales staff was "too focused on the internal integration program and not focused enough on our go-to market activities," and as a result "experienced sales challenges that we believe are the result of not having enough attention on programs and merchandising that could have and should have generated incremental sales opportunities at existing accounts."  The Company "overloaded the newly acquired team with an administrative workload that interfered with their day jobs and distanced them from the private label marketplace." (¶ 233).

c.     The difficulty in integrating the business operations between TreeHouse and Private Brands made it more difficult for sales staff to sell to customers.  "[A] single sales person now has more systems that they need to pull information from in order to bring the right facts and information to the customer. And in effect what happened is they

spent more time in front of their screen getting all the pieces of information together and a little bit less time with their customer." (¶ 235).

305.     Defendants' statements during the Class Period that TreeHouse had optimized its sales staff along four major product-line categories (False Statement Nos. 31-32) were materially false and misleading.  TreeHouse had only optimized the condiments sales staff along product categories starting in the third quarter of 2016 and condiments only comprised 7% of Private Brands net sales.  *See* ¶ 298.  The other product categories were not optimized along product lines and the sales staff was required to sell across 26 or more product categories.

## LOSS CAUSATION

306.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class.

307.     During the Class Period, Lead Plaintiff and the Class purchased TreeHouse's common stock at artificially inflated prices and were damaged thereby.  The price of the Company's common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

308.     Specifically, Defendants' disclosures on November 3 and 4, 2016, concerning the operations of Private Brands and Flagstone revealed the truth with respect to the disarray of the Private Brands sales staff and the inability of Defendants to monitor that sales staff, as well as TreeHouse's delay and difficulty integrating its acquisitions, including its difficulty integrating the Flagstone business.  This implicated TreeHouse's entire business model and claimed advantage, as TreeHouse had been unable to generate growth organically.

309.     TreeHouse's third quarter 2016 operating results revealed the truth with respect to TreeHouse's inability to successfully integrate new, large businesses, including Flagstone and Private Brands.

310.     If defendants had told the truth with respect to the lack of integration and the lower than projected operating results of Flagstone earlier in the Class Period then the common stock would not have traded at inflated levels.

311.     When this truth was reported to the market, TreeHouse's common stock plummeted by $16.87 per share or nearly 20% on November 3, 2016.

## SCIENTER ALLEGATIONS

312.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding TreeHouse, their control over, and/or receipt and/or modification of TreeHouse's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning TreeHouse, participated in the fraudulent scheme alleged herein.  These facts support an inference of scienter that is stronger than any contrary inference.

313.     As the Company's most senior executives, the Individual Defendants were active, culpable, and primary participants in the fraud as evidenced by their knowing issuance and

control over the Company's materially false and misleading statements.  Further, the Individual Defendants were senior officers of TreeHouse during the Class Period and had final approval over the public statements issued in the name of the Company.

314.    Defendants were motivated throughout the Class Period to maintain the perception that they were skilled managers who could successfully integrate large companies. This kept the acquisition machine that was critical to the Company's growth humming along. Without the belief in an unblemished track record, the Company would face greater obstacles to issuing equity or increasing debt to finance these acquisitions.

315.    The Company would not have been able to raise capital to acquire Private Brands if its integration difficulties with Flagstone were revealed, and the viability of its entire business model and strategy would have lost credibility in the market if its difficulties in integrating the Private Brands acquisition were revealed.

316.    Furthermore, the Company announced defendant Riordan's intended retirement in August, 2016, just as Sliva was stepping into the role of President.  Riordan therefore was incentivized to ensure that his legacy, and substantial equity ownership in TreeHouse, were not impacted by a failed integration of Private Brands, along with Flagstone, by far the two biggest acquisitions.

317.    As the most senior officers of the Company, defendants Reed, Riordan, and Sliva were responsible for the operations of Private Brands and had intimate knowledge of the various issues within the Private Brands' sales force, including problems that sales people (1) were required to sell 26 or more products at a time; (2) were not familiar with the full product line; (3) were unable to access inventory and other information concerning the Private Brands' products necessary to secure orders from customers, and (4) were distracted by integration efforts.

318.     The Individual Defendants' large TreeHouse stock holdings, strongly indicate that the Individual Defendants had personal interests in maintaining TreeHouse's stock price inflated as high as possible.  Moreover, the 2016 Proxy stated that as part of the Company's "pay-for-performance compensation philosophy," "the actual compensation received by each executive is determined by the financial and stock performance of the Company" and the Company "deliver[s] a substantial portion of [named executive officers'] total compensation in the form of equity awards and other long-term incentive vehicles" "that encourage value creation, retention, and stock price appreciation."  The Individual Defendants' total compensation pay mix in 2015 was based on the following:

| Defendant | % Base Salary | % Annual Incentive | % Long-Term Incentive |
|-----------|---------------|--------------------|-----------------------|
| Reed | 16% | 15% | 69% |
| Riordan | 25% | 18% | 57% |
| Sliva | 28% | 20% | 52% |

319.     Defendant Reed was the Chief Executive Officer and Chairman and defendant Riordan was the Chief Financial Officer, and currently serves as the Company's President.  In connection with each quarterly report and the annual report TreeHouse filed with the SEC during the Class Period, defendants Reed and Riordan signed certifications pursuant to SOX.  Pursuant to applicable law, every Form 10-Q and Form 10-K filed with the SEC and reporting a company's quarterly or annual financial performance must be accompanied by SOX certifications signed under oath by personnel able to attest to the veracity of the underlying financial reports.  Defendants Reed and Riordan certified under oath quarter after quarter during the Class Period that all financial reports filed by TreeHouse with the SEC complied with Section 13(a) or 15(d) of the Exchange Act and that each such report "fairly presents, in all material respects, the financial condition and results of operations of the Company."

320.    The SOX certifications stated that the financial information contained in the respective Form 10-Q and Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.  Specifically, the certifications represented that the Company's Form 10-Qs and 10-K did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  The SOX certifications also stated that defendants Reed and Riordan have disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting."

321.    The SOX certifications signed by defendants Reed and Riordan were materially false and misleading because, at the time they were executed, these individuals were aware of, or recklessly disregarded, the severe deficiencies in the Company's controls from a financial and operational perspective.  Defendants Reed and Riordan were in positions to know that the Company lacked internal controls.  The SOX certifications are strong indicia of scienter because the fraud at issue directly implicates the adequacy of the Company's systems of internal control.

322.    The Individual Defendants had access to material information regarding the Company's core operations, including sales orders, shipments, and revenue on its Flagstone and Private Brands businesses.  The Flagstone and Private Brands businesses are part of TreeHouse's core operations as they were the largest companies that TreeHouse acquired.  With the

acquisition of Private Brands, TreeHouse more than doubled its revenues or $3.9 billion, from $2.3 billion in revenue in 2013 to $6.2 billion in revenue in 2016.

323.     Therefore, the Individual Defendants are presumed to have knowledge of material facts regarding those core operations; and with the importance of the integration of these key acquisitions in the constant forefront of management and analyst discussions, and with Defendants repeatedly voluntarily addressing the state of their integration, and with defendant Reed accepting "clear accountability" as TreeHouse's Chairman and CEO, such knowledge is to be presumed all the more.  As senior officers of TreeHouse during the Class Period, the Individual Defendants had final approval of the Company's core operations and had actual acknowledge of problems integrating Flagstone and Private Brands onto TreeHouse's SAP management system.

324.     Defendants had actual knowledge that Flagstone was not integrated onto TreeHouse's SAP platform, and as CW1 stated there had been no efforts to integrate processes between the two companies.

325.     Defendants had actual knowledge that Flagstone had failed to achieve either net sales or profit estimates for 2014 or 2015 and that its profit margins, given the lack of integration with TreeHouse (as admitted by Foulston on the February 9, 2017 conference call), were insufficient to justify the goodwill valuation on Flagstone's balance sheet.

326.     Executives at TreeHouse were regularly informed of the progress of the sales teams at Flagstone.  For example, Sliva regularly participated in internal quarterly sales calls at Flagstone.  CW1 participated in those calls as well to get insight into what to expect for demand planning purposes.

327.    CW1 recalled that the "priority, number one goal" conveyed during the quarterly sales calls was that the sales organization had to get "back on track."  CW1 identified specific "customers dropped due to performance" issues.  As detailed further herein, TreeHouse lost business from Costco and Walmart during the Class Period.  Issues with these customers were discussed during the quarterly sales calls.

328.    During these sales calls, CW1 recalled that M.B. made comments about issues at TreeHouse.  M.B. specifically stated that the legacy Flagstone operation in St. Paul "needed to pick it up because it was known the coffee side of the business was failing."  M.B. made these comments when Sliva was present on the sales calls.

329.    Defendant Riordan also participated on quarterly conference calls prior to the release of operating results.  The subject matter on those calls was always how to present Flagstone's operations in the best possible light to investors.  CW1 recalls specifically a sales interruption during 2016 that resulted from Flagstone's decision to stop purchasing banana chips from a supplier in the Philippines that was implicated in a child labor scandal.  CW1 recalls Riordan and others treating the issue as a laughing matter and stating that they would wait 90 days and go back to using the same supplier.  During the call, Riordan made it clear that he did not want the child labor issue to become public knowledge.

330.    In addition to these conference calls, TreeHouse executives also received regular reports on the performance of the divisions.  CW1 explained that there were weekly "data pushes" from Flagstone to the TreeHouse executives.  These "data pushes" were reports on actual production and sales versus forecasts.  M.B. or other Flagstone executives emailed these data reports directly to TreeHouse executives, including the Individual Defendants, and/or discussed them on conference calls.  M.B.'s reports were based on data from Cimpro, the system

used to update sales figures which updated each night. CW1 was copied on one of these weekly email updates to defendant Reed in approximately March 2016.

331. CW1 was aware that defendant Reed was receiving finance updates each week through at least August 2016. As CW1 explained, he assisted a temporary accountant working at the St. Paul facility in August 2016 ("B.Z."), with preparing a financial report on the results of operations using MS Access. B.Z. informed CW1 that he needed the report because he was required to send the report "to Sam each week."

332. CW1 stated that Flagstone employees would periodically receive group emails on behalf of defendant Reed, sent by his assistant. Reed's emails mentioned that TreeHouse "had ground to make up" and that TreeHouse needed to "turn things around."

333. Reed always referenced that everyone was part of one TreeHouse. However, CW1 emphasized that "everyone knew that we were not one TreeHouse."

334. There were also quarterly town hall meetings. Defendants Reed, Riordan, or Sliva attended most of these town hall meetings by phone, and their presence was announced at the beginning of the meetings.

335. There was one particular meeting in the early spring 2016 timeframe. During this meeting, the attendees reviewed "second quarter, and looked into the third and fourth quarter" for 2016. CW1 recalled that the TreeHouse Division President of Snacks made a comment during the meeting that TreeHouse was "not going to make the year," and that TreeHouse was "going to have to do what we can" to try to meet expectations. M.B. and E.C. were also in attendance at this meeting.

336. CW1 listened in to TreeHouse's first and second quarter 2016 investor calls. CW1 noted that the Defendants failed to disclose to investors that the Company had acquired the

"giant ConAgra," but had "no infrastructure" and was making "no changes" to the systems and processes to support integration of the new acquisition (or the existing Flagstone operations). CW1 pointed specifically to the inadequate systems TreeHouse had in place for managing "raw input and finished goods." As CW1 emphasized, Defendants painted a "rosy picture" of the integration efforts relating to ConAgra "the whole time." Internally, however, CW1 and others were painfully aware that Flagstone and ConAgra were "separate and siloed" from TreeHouse.

337. Defendants also represented to investors that they not only monitored the performance of the Company's sales teams, but they also collected register scan data to determine how well the products were actually selling at the retail stores. For example, at the February 12, 2015, conference call with analysts, defendant Reed discussed their review of scan data to evaluate how sales for tree nut snacks responded to the increase in price of the raw products after the drought in California. (4Q 2014 Tr. at 9); *see also* Q1 2016 Tr. at 3 (Reed discussing IRI scanner data). Thus, Defendants had access to near real-time data about their divisions' performance.

338. When a senior officer of a company makes false and misleading public statements regarding its core operation, there is a strong inference that such officer knew the statement was materially false and misleading when made. Stated otherwise, knowledge of falsity can be imputed to key officers who should have known of facts relating to the core operations of their company. Moreover, as signatories to the Company's SEC filings, defendants Reed and Riordan had an affirmative obligation to familiarize themselves with the facts relevant to the Company's core operations, including the Flagstone and Private Brands businesses. To the extent that defendants Reed and Riordan failed to fulfill that obligation, their recklessness would satisfy the scienter element of a claim brought under Section 10(b) and Rule 10b-5.

339. Defendants had announced as early as August 4, 2016, that the organization of their sales staff was broken and that they were reorganizing their sales staff around product lines (rather than customers). Defendants subsequently announced that they had completed the conversion of the first product line (condiments) in the second quarter of 2016:

> Next, we are also consolidating our several operating units, including Bay Valley Foods, E.D. Smith and Flagstone Foods into one operating company under the direction of Chris Sliva, now President of Bay Valley Foods. The new operating company will be fully formed late next year, once all product categories, sales channels and supply chain functions are united under a common ERP platform. Go-to-market functions will be consolidated under our three current SEC segments organized by channel of distribution. Category-based business units will be grouped into four consumer product based divisions: beverages, condiments, meals and snacks. Flagstone, which will retain its better-for-you growth dictate, will form the core of the snacks pillar. The underlying rationale for this organization evolution is fivefold, execute our portfolio strategy in full, increase speed to market, simplify unwarranted complexity, improve financial performance and prepare for further growth.

340. Thus, Defendants knew of the difficulties experienced within the remaining 93% of Private Brands' sales staff. In fact, defendant Reed had already recognized the need to reorganize the sales department along consumer product lines as early as August 2015. *See* ¶¶ 234-240.

341. Defendant Riordan had stated on the February 11, 2016, conference call that TreeHouse would only issue "specific quarterly guidance" after "we get the cadence of sales and earnings right." Yet, on February 9, 2017, TreeHouse issued quarterly guidance even though "[w]e knew our very quick growth had made it just too difficult for our customer-oriented teams to fully understand the 32 product categories we sell." 4Q 2016 Tr. at 4.

342. Thus, it is not credible that Defendants were unaware during the first three quarters of 2016 that sales of Private Brands was suffering because the sales staff was organized around customers rather than product lines.

88

343.    Nor is it credible that the Individual Defendants did not know as of August 4, 2016, that the Private Brands sales staff was too distracted by administrative responsibility to secure additional promotional sales.  That lack of sales would have already been reflected in Private Brands' order book.

344.    As Bishop was one of the five "highly compensated officers" in TreeHouse as the Company's Chief Strategy Officer and was the Integration Lead of the Steering Committee in respect to the integration of Private Brands, she had intimate knowledge with TreeHouse's core operations, including Private Brands, and therefore, her statements during the Class Period are attributable to the Company.  The Steering Committee comprised of senior executives from both TreeHouse and the Private Brands business, including Bishop and defendant Riordan, "with direct leadership of dedicated operational teams for sales, go-to-market, and human resource teams, as well as the workgroups tasked with integrating support functions and capturing related synergies" according to analysts at William Blair.

345.    Bishop emphasized at the September 7, 2016 Barclay's presentation that "priority number one and every team member can recite it, is to make sure that both businesses deliver their 2016 plans."  Given the acknowledged level of focus on sales the most compelling inference is that each of the Defendants was aware of the disarray within the Private Brands sales force.  *See also* Reed at ¶ 211 ("the organizational changes that we're putting into place have absolutely no element of additional risk.").

346.    Further, Bishop, one of TreeHouse's top executives participated on conference calls with analysts and the investing public.  For example, on September 9, 2016, Bishop, along with the Individual Defendants, participated at the Barclays Conference.  At that conference Bishop represented that the ERP with respect to the Private Brands' condiments business

integrated to TreeHouse legacy on July 11, "had no impact to service levels, no impact to customers." However, by this time, Bishop had full knowledge that the lack of integration of Private Brands with TreeHouse's SAP management system was causing serious disruptions with Private Brands' sales force.

347.    The creation of the Steering Committee, led by Bishop and defendant Riordan, gave TreeHouse direct involvement and knowledge in the Private Brands' day-to-day operations including the disappointing conditions of the Private Brands Business's sales team and sales numbers, and status of integrating Private Brands with TreeHouse's SAP management system.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

348.    The market for TreeHouse's common stock was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, TreeHouse's common stock traded at artificially inflated prices during the Class Period. On July 11, 2016, the Company's common stock price closed at a Class Period high of $104.35 per share. Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's common stock relying upon the integrity of the market price of TreeHouse's common stock and market information relating to TreeHouse, and have been damaged thereby.

349.    During the Class Period, the artificial inflation of TreeHouse's common stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about TreeHouse's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of

TreeHouse and its business, operations, and prospects, thus causing the price of the Company's common stock to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's common stock at such artificially inflated prices, and each of them has been damaged as a result.

350. At all relevant times, the market for TreeHouse's common stock was an efficient market for the following reasons, among others:

a. TreeHouse common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b. Shares of TreeHouse common stock were actively traded. Average reported weekly trading volume of TreeHouse shares during the Class Period was 3,525,641 shares, or 6.2% of the total outstanding TreeHouse shares during the Class Period available to trade;

c. As a regulated issuer, TreeHouse filed periodic public reports with the SEC and/or the NYSE;

d. TreeHouse regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

e. TreeHouse was followed by over twelve securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed

91

to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace. There was also extensive news coverage of TreeHouse.

351.   Empirical facts demonstrate a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the Company's stock price. For example, on November 3, 2016, TreeHouse shares closed at $69.72 a share, a $16.87 price decline from their November 2, 2016, closing price, in response to TreeHouse's poor third quarter operating results. Trading volume was 7.2 million shares on November 3, 2016, compared to average daily trading volume during the Class Period of approximately 723,000 shares.

352.   TreeHouse's market capitalization during the Class Period was approximately $4.5 billion, sufficient to demonstrate market efficiency.

353.   The market for TreeHouse's common stock promptly digested current information regarding TreeHouse from all publicly available sources and reflected such information in TreeHouse stock price. Under these circumstances, all purchasers of TreeHouse's common stock during the Class Period suffered similar injury through their purchase of TreeHouse's common stock at artificially inflated prices and a presumption of reliance applies.

354.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to

recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

## NO SAFE HARBOR

355.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. To the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of TreeHouse who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

356.     Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities who purchased TreeHouse's common stock between January 20, 2016, and November 2, 2016, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their

93

immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

357.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, TreeHouse's common stock actively traded on the NYSE.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of TreeHouse shares were traded publicly during the Class Period on the NYSE.  As of October 31, 2016, the Company had 56,730,620 shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by TreeHouse or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

358.     Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

359.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

360.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.     whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, integration efforts, and prospects of TreeHouse;

c. whether the Individual Defendants caused TreeHouse to issue false and misleading financial statements during the Class Period;

d. whether the Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e. whether the prices of TreeHouse common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

f. whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

361. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## FIRST CAUSE OF ACTION

**Violation of Section 10(b) of the Exchange Act and SEC
Rule 10b-5 Promulgated Thereunder
Against All Defendants**

362. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

363.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) caused Lead Plaintiff and other members of the Class to purchase TreeHouse's common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

364.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for TreeHouse's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

365.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about TreeHouse's financial well-being and prospects, as specified herein.

366.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of TreeHouse's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about TreeHouse and its business operations, integration efforts, and future prospects in light of the circumstances under which

they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

367.   Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants directly made, or was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

368.   Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing TreeHouse's financial well-being and prospects from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, integration efforts, financial well-being, and prospects throughout the Class Period,

97

Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

369.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of TreeHouse's common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired TreeHouse's common stock during the Class Period at artificially high prices and were damaged thereby.

370.    At the time of said misrepresentations and/or omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that TreeHouse was experiencing, which were not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their TreeHouse common stock, or, if they had purchased or acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

371.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

372.     As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## SECOND CAUSE OF ACTION

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

373.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

374.     The Individual Defendants acted as controlling persons of TreeHouse within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level position, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

375.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged

herein, and exercised the same.  Moreover, the Individual Defendants made many of the materially false or misleading statements described above.

376.    As set forth above, TreeHouse and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their position as a controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

a.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b.      Awarding damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.      Such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Lead Plaintiff hereby demands a trial by jury.

Dated:  March 24, 2017

Respectfully submitted,

ROBINSON CURLEY & CLAYTON, P.C.

/s/ Alan F. Curley
C. Philip Curley
Alan F. Curley
300 South Wacker Drive, Suite 1700
Chicago, IL  60606
Tel.: (312) 663-3100
Fax: (312) 663-0303
pcurley@robinsoncurley.com
acurley@robisnoncurley.com

*Attorneys for Lead Plaintiff the Public
Employees' Retirement System of Mississippi
and Liaison Counsel for the Class*

Chet B. Waldman
Robert C. Finkel
Matthew Insley-Pruitt
Fei-Lu Qian
WOLF POPPER LLP
845 Third Avenue, 12th Floor
New York, New York 10022
Tel.: (212) 759-4600
Fax: (212) 486-2093
cwaldman@wolfpopper.com
rfinkel@wolfpopper.com
minsley-pruitt@wolfpopper.com
fqian@wolfpopper.com

*Attorneys for Lead Plaintiff the Public
Employees' Retirement System of Mississippi
and Lead Counsel for the Class*

101