**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, INDIVIDUALLY AND ON BEHALF OF ALL SIMILARLY SITUATED, | ) ) ) ) | Case No. 16-cv-10632 |
| | ) | Judge Robert M. Dow, Jr. |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| TREEHOUSE FOODS, INC., et al., | ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is lead Plaintiff's motion for class certification [125]. For the reasons set forth below, the motion is granted. Plaintiff is appointed class representative and Wolf Popper LLP and Robinson Curley P.C. are appointed lead and liaison counsel. The case is set for further status on March 10, 2020 at 9:00 a.m.

**I.      Background**

Defendant TreeHouse Foods may be the biggest company you have never heard of. It produces packaged foods for stores' "private labels"—that is, it makes grocery stores' off-brand products. Lead Plaintiff Public Employees' Retirement System of Mississippi ("MSPERS") is an institutional investor that purchased TreeHouse common stock ("stock").

As is relevant for the present motion, TreeHouse purchased several smaller food-production companies between 2006 and 2014. In late 2014, TreeHouse purchased Flagstone (another food company), and in 2015, it moved to purchase its largest competitor, Private Brands, from ConAgra. The sale of Private Brands closed in February 2016. During and following the

closing on Private Brands, TreeHouse and its officers made a series of statements regarding the integration of Private Brands into the TreeHouse supply and production chain and future growth opportunities. On November 3, 2016, TreeHouse reported that its earnings had fallen below forecasts and that its president, Defendant Christopher Sliva would resign. As a result of these disclosures, the stock price fell $16.87 (nearly 20%). Later that day, after the markets closed, Treehouse acknowledged that Flagstone was underperforming as well, but it is unclear whether the market further fell as a result of that news.

Plaintiff alleges that Treehouse's statements painting a rosy picture of the various acquisitions were fraudulent, and therefore violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and the Securities and Exchange Commission's Rule 10b-5, 17 C.F.R. § 240.10b-5. See also 15 U.S.C. § 78t(a) (imposing individual liability under § 20(a) of the Securities Exchange Act). Plaintiff now moves [125] to certify "a plaintiff class consisting of all persons and entities who purchased TreeHouse Foods, Inc. ("TreeHouse") common stock on the open market between January 20, 2016, and November 2, 2016, inclusive (the "Class Period"), and who were damaged thereby (the "Class")."[1] [125 at 1]. MSPRS also seeks to be appointed Class Representative and to have Wolf Popper LLP and Robinson Curley P.C. appointed as Lead and Liason Counsel for the certified class. In support of its motion, MSPERS has attached an expert report from Chad Coffman [126-3] opining on the efficiency of the market for TreeHouse stock and the feasibility of computing damages on a class-wide basis. Defendants have attached a report [129-7] from their own expert, Dr. Paul Zurek, who opined exclusively on the feasibility of determining damages on a class-wide basis.

---

[1] The proposed class excludes Defendants, officers and directors of TreeHouse, their families, and their legal representative, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

## II.     Legal Standard

To be certified as a class action, a proposed class must satisfy the requirements of Federal Rule of Civil Procedure 23(a), as well as one of the three alternative requirements in Rule 23(b). *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). Rule 23(a) provides that a named party may sue on behalf of individuals who are similarly situated if: (1) the class is so numerous that joinder of all putative class members is impracticable ("numerosity"); (2) there are questions of law or fact common to the putative class ("commonality"); (3) the claims or defenses of the named party are typical of the claims or defenses of the putative class members ("typicality"); and (4) the named party will fairly and adequately protect the interests of the class ("adequacy"). Fed. R. Civ. P. 23(a). "[A] proposed class must always meet the Rule 23(a) requirements." *Messner*, 669 F.3d at 811. "Because Rule 23(a) provides a gate-keeping function for all class actions, ordinarily [courts] begin there and only turn * * * to Rule 23(b) after [the court is] certain that all of Rule 23(a)'s requirements had been met." *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 374 (7th Cir. 2015).

Rule 23(b) sets forth four circumstances under which a class action may be maintained; here Plaintiff rely on Rule 23(b)(3). Rule 23(b)(3) permits class certification if: (1) questions of law or fact common to the members of the proposed class predominate over questions affecting only individual class members ("predominance"); and (2) a class action is superior to other available methods of resolving the controversy ("superiority"). *Messner*, 669 F.3d at 811. Finally, the class must also meet Rule 23's "implicit requirement of 'ascertainability,' " meaning that the class is "defined clearly and based on objective criteria." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015).

Plaintiffs bear the burden of proving that they are entitled to class certification. *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). Although class certification proceedings are not "a dress rehearsal for the trial on the merits," *Messner*, 669 F.3d at 811, for purposes of deciding the certification question, the Court does not presume that all well-pleaded allegations are true. See *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676-77 (7th Cir. 2001). Rather, before it allows a case to proceed as a class action, the Court "should make whatever factual and legal inquiries are necessary under Rule 23." *Id.* at 676. "A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). But the showing need not be "to a degree of absolute certainty. It is sufficient if each disputed requirement has been proven by a preponderance of evidence." *Messner*, 669 F.3d at 811 (citation omitted). The Court exercises broad discretion in determining whether class certification is appropriate given the particular facts of the case. *Keele v. Wexler*, 149 F.3d 589, 592 (7th Cir. 1998).

## III. Analysis

Here, MSPERS seek to certify as a Rule 23(b)(3) class. Defendants object on the following grounds: (1) MSPERS is atypical and inadequate because it is subject to unique defenses; (2) MSPERS is otherwise inadequate; and (3) MSPERS's proposed damages model cannot be used to show that class issues predominate. Nonetheless, in the interest of completeness, the Court considers all of the Rule 23 factors.

### A. Rule 23(a) Factors

### 1.  Numerosity

Defendant does not contest that the putative class meets Rule 23(a)(1)'s requirement that it be "so numerous that joinder of all members is impracticable." See Fed. R. Civ. P. 23(a)(1). In any event, the putative class meets this standard. "While there is no threshold or magic number at which joinder is impracticable, a class of more than 40 members is generally believed to be sufficiently numerous for Rule 23 purposes." *Ringswald v. County of DuPage*, 196 F.R.D. 509, 512 (N.D. Ill. 2000) (citations omitted). Further, "a plaintiff does not need to demonstrate the exact number of class members as long as a conclusion is apparent from good-faith estimates." *Barragan v. Evanger's Dog & Cat Food Co., Inc.*, 259 F.R.D. 330, 333 (N.D. Ill. 2009). Here, Plaintiff has submitted evidence that the average weekly trading volume of Treehouse shares was 4.02 million, representing over 7% of more than 50 million outstanding shares. That is more than enough to meet the numerosity requirement in a case such as this. *E.g. In re Groupon, Inc. Securities Litigation*, 2014 WL 5245387, at *1 (N.D. Ill. Sept. 23, 2014) (*Groupon I*) (holding that a putative class was sufficiently numerous when 40.25 million shares of stock were outstanding).

### 2.  Commonality

Defendants do not contest that there are common questions of law or fact to the class. See Fed. R. Civ. P. 23(a)(2). In any event, commonality is a "low hurdle" that is easily surmounted in securities fraud cases such as this. See *Groupon I*, 2014 WL 5245387, at *1 (quoting *Roth v. Aon Corp.*, 238 F.R.D. 603, 606 (N.D. Ill. 2006)). Indeed, each class member's claim hinges on common factual and legal questions, such as "whether defendants made material misrepresentations or omitted material facts, whether defendants acted with the requisite scienter, and whether defendant's conduct inflated the price of [the] stock." *Grossman v. Waste Management, Inc.*, 100 F.R.D. 781, 785–86 (N.D. Ill. 1984).

### 3.    Typicality and Adequacy

"The typicality and adequacy requirements tend to merge, and they 'serve as guideposts' for determining whether 'the named plaintiff's claims and the class claims are so interrelated that the interests of the class will be fairly and adequately protected in their absence.'" *In re Northfield Laboratories, Inc. Securities Litigation*, 267 F.R.D. 536, 541 (N.D. Ill. 2010) (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997). Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Claims of class representatives and class members are typical if they arise from the same practice or course of conduct and are based on the same legal theory. *Keele*, 149 F.3d at 595. "Typical does not mean identical, and the typicality requirement is liberally construed." *Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 57 (N.D. Ill. 1996). Typicality is meant to ensure that the claims of the class representatives have the "same essential characteristics as the claims of the class at large." *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993) (citation and internal quotation marks omitted). "[T]here must be enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano v. The Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011). Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). For the adequacy requirement to be satisfied, the claims and interests of the named Plaintiffs must not conflict with those of the class, the class representatives must have sufficient interest in the outcome of the case, and class counsel must be experienced and competent. *Retired Chicago Police Ass'n*, 7 F.3d at 598 (7th Cir. 1993).

"'The presence of even an arguable defense peculiar to the named plaintiff * * * may destroy the required typicality of the class as well as bring into question the adequacy of the named

plaintiff's representation,'" because the plaintiff would be "likely to devote too much attention to rebutting an individual defense." *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011) (quoting *J. H. Cohn & Co. v. American Appraisal Associates, Inc.*, 628 F.2d 994, 999 (7th Cir. 1980)). Importantly, the Court need not reach the merits of the defense, for a defendant can defeat class certification motion by showing that it can pose a "[s]erious challenge[] to typicality and adequacy." *Id.* at 728 (suggesting that there must "exist[] admissible evidence so severely undermining" of typicality and adequacy).

Here Defendants question MSPERS's typicality and adequacy on the grounds that it is subject to unique defenses, which Defendants claim will bog the case down in individualized questions. Additionally, Defendants question whether MSPERS, a frequent litigant with cozy ties to counsel, is sufficiently invested in the outcome of the case to adequately represent the absent class members.

### a. *MSPERS's claim is not subject to unique defenses*

"To recover damages for violations of section 10(b) and Rule 10b–5, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 269 (2014) (*Halliburton II*) (quotation marks and citations omitted). MSPERS brings this securities fraud class action under a "fraud-on-the-market" theory. Briefly:

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business[]. Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements[]. The causal connection

between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.

*Basic Inc. v. Levinson*, 485 U.S. 224, 241–42 (1988) (citations and quotation marks omitted). In other words, if the security in question was part of "an open and developed [] market," the stock price definitionally incorporated all public information, including any untruths promulgated by the company or its officers. *Id.* Thus, if a plaintiff can show that the market for a given stock functioned efficiently, it creates a rebuttable presumption that it relied on a fraudulent statement, even if it was not directly aware of the fraud. *Id.* at 250. "The *Basic* presumption is a strong one," *Glickenhaus & Co. v. Household Intern., Inc.*, 787 F.3d 408, 429 (7th Cir. 2015), but "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Basic*, 485 U.S. at 248; see also *Halliburton II*, 573 U.S. at 269 ("So for example, if a defendant could show that the alleged misrepresentation did not, for whatever reason, actually affect the market price, or that a plaintiff would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud, then the presumption of reliance would not apply.")

First, Defendants do not dispute that Plaintiffs are entitled to the rebuttable *Basic* presumption. Regardless, Plaintiffs have demonstrated that they meet each of the five factors supporting market efficiency outlined in *Cammer v. Bloom*¸ 711 F. Supp. 1264 (D.N.J. 1989).[2] The *Cammer* factors include: "(1) average weekly trading volume during the class period; (2)

---

[2] *Cammer* has not been explicitly adopted by the Seventh Circuit, but it is frequently used to determine whether a market for a given security is efficient. *E.g.*, *In re Groupon, Inc. Securities Litigation*, 2015 WL 1043321, at *3 (N.D. Ill. March 5, 2015) (*Groupon II*), objections overruled, 2015 WL 13628131 (N.D. Ill. May 12, 2015); *In re Northfield Laboratories,* 267 F.R.D. at 545–46; see also *Schleicher v. Wendt*, 2009 WL 761157, at *5–10 (S.D. Ind. March 20, 2009), aff'd 618 F.3d 679 (7th Cir. 2010) (applying *Cammer* factors and granting class certification).

number of security analysts who followed and reported on the stock during the class period; (3) number of market makers; (4) whether the company was entitled to file an [SEC] S–3 Registration Statement; and (5) whether empirical facts demonstrate a cause-and-effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Groupon II*, 2015 WL 1043321, at *3 (citing *Cammer*, 711 F. Supp. at 1285–87). Here, Plaintiffs have demonstrated that the market for TreeHouse's stock is efficient, because: (1) the average weekly trading volume for TreeHouse stock was 7.38% of outstanding shares, well above the average for the New York Stock Exchange, see [126-3, ¶¶ 25–29]; *Cammer*, 711 F. Supp. at 1293 (citation omitted); (2) sixteen analysts wrote 97 reports about TreeHouse during the class period, see [126-3, ¶¶ 30–35], *Cammer*, 711 F. Supp. at 1286; (3) there were over 100 market makers, and, in any event, TreeHouse stock is traded on the NYSE, see [126-3, ¶¶ 40]; *Cammer*, 711 F. Supp. at 1293; (4) TreeHouse was eligible to file an S–3 Registration Statement, and in fact did so before and after the Class Period, see [126-3, ¶¶ 41–43]; *Groupon II*, 2015 WL 1043321, at *4; and (5) the market for TreeHouse stock responded immediately to unexpected news, see [126-3, ¶¶ 44–63]; *In re Northfield Laboratories*, 267 F.R.D. at 548–49 .[3] The Court need not address the additional factors discussed in MSPERS's expert's report, given that it has satisfied the baseline test for market efficiency, and Defendants do not contest as much.

Defendant argues, however, that notwithstanding the efficiency of the market for TreeHouse's stock, MSPERS is subject to unique defenses related to its reliance on the market price. First, Defendants argue that MSPERS's deferral to its outside investment manager Wedgewood severed the link between the misrepresentation and price paid. Second, Defendants

---

[3] Although Defendants (and their expert) dispute Coffman's use of an event study, Defendants' expert did not address whether the event study demonstrated market efficiency. See [129-7 at 4 n.1]. Dr. Zurek's discussion of the event study goes to predominance, which is discussed below.

argue that Wedgewood's purchase of stock following the corrective statement shows that it did not rely on the market price.

First, MSPERS's reliance on a third party does not subject it to unique defenses. As one of Defendants' own cases explained, "Reliance on a broker does not necessarily constitute a unique defense. In fact, it is quite likely that other class members relied on a broker, friend, or family member in deciding to make their purchases." *Epstein v. American Reserve Corp.*, 1988 WL 40500, at *3 (N.D. Ill. April 21, 1988); see also [129 at 10 (citing *id.* at *4 for the proposition that "MSPERS will be subject to unique defenses with respect to reliance, materiality, and causation" because it relied on Wedgewood)]. That is, a class representative is not atypical or inadequate for relying on an outside broker, manager, or expert unless that third party itself would be subject to unique defenses.[4] *Epstein*, 1988 WL 40500, at *4; see also *In re Diamond Foods, Inc., Securities Litigation*, 295 F.R.D. 240, 252 (N.D. Cal. 2013) (holding that MSPERS's reliance on a different third-party investment manager in a different case did not render it atypical or inadequate). Thus, Defendants' cases are inapposite, because in each of them the broker or adviser explicitly disclaimed reliance on the market price. *Epstein*, 1988 WL 40500, at *4 (broker subject to unique defenses when he admitted to "speculation" and may have acted on insider information); *Cohen v. E.F. Hutton & Co., Inc.*, 1988 WL 89437, at *2 (N.D. Ill. Aug. 22, 1988) (subject to unique defense when the only advice he solicited about the stock concerned the tax benefits of investment).

Second, relatedly, Plaintiff's purchase of additional TreeHouse stock following the November 3, 2016 corrective disclosure does not render it atypical or inadequate. The majority approach holds that purchasing stock after a corrective disclosure does not, on its own, subject a

---

[4] As discussed below, in some instances a lead plaintiff may be inadequate if it was "completely unaware" of its broker's trading strategy. See *Retsky Family Ltd. Partnership v. Price Waterhouse LLP*, 1999 WL 543209, at *5–6 (N.D. Ill. July 23, 1999).

Plaintiff to a unique defense. See, e.g., *Menaldi v. Och-Ziff Capital Management Group, LLC*, 328 F.R.D. 86, 93 (S.D.N.Y. 2018) (collecting cases); *In re Montage Technology Group Limited Securities Litigation*, 2016 WL 1598666, at *4 (N.D. Cal. April 21, 2016) (collecting more cases); *Fry v. UAL Corp.*, 136 F.R.D. 626, 632 (N.D. Ill. 1991) ("[S]ubsequent purchases by the plaintiffs are irrelevant to the liability of [defendant] with regard to alleged misrepresentations effecting the earlier sales of securities * * *"); see also *In re DaimlerChrysler AG Securities Litigation*, 216 F.R.D. 291, 298–99. (D. Del. 2003) (suggesting that subsequent purchases are never "unique" to the named plaintiff); but see *Rocco v. Nam Tai Electronics, Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007) (citing to minority approach cases).

As above, many of the cases that Defendants cite are inapposite because they found that post-disclosure purchases defeated typicality and adequacy when combined with a trading strategy that disclaimed reliance on the market price. See *In re Safeguard Scientifics*, 216 F.R.D. 577, 582–83 (E.D. Pa. 2003) (plaintiff was a day-trader, who purchased and sold based on minute, relative changes in the market that had nothing to do with cardinal price; post-disclosure purchases were further evidence of this strategy); *GAMCO Investors, Inc. v. Vivendi, S.A.*, 927 F.Supp.2d 88, 100-102 (SDNY 2013) (plaintiff had separate valuation algorithm that had nothing to do with stock price and did not factor in fraudulent statements; substantial post-disclosure purchases underscored non-reliance on publicly-available information). Because there is no evidence that MSPERS (and its broker Wedgewood) employed a trading strategy independent of market price, the Court will follow the majority rule and conclude that MSPERS's subsequent purchase of TreeHouse stock does not render it subject to a unique defense.

Defendants' further arguments on this point are unconvincing. Defendants essentially argue that Wedgewood disclaimed reliance on the alleged misrepresentations when it explained

its *post*-disclosure purchase strategy. But Wedgewood's letter came following the November 3, 2016 disclosure, and is therefore "irrelevant * * * with regard to alleged misrepresentations effecting the earlier sale of securities." *Fry*, 136 F.R.D. at 632. Rather, the Wedgewood statements explained that they thought that the market overreacted to the news—which, as a matter of logic and economic theory, is the same thing as buying the stock in the first place. See *In re Diamond Foods*, 295 F.R.D. at 251 (citation omitted). Defendants also point to language in the Wedgewood explanation that suggests that Wedgewood did not believe that there had been a fraud in the first place—that is, Wedgewood "believed TreeHouse." [129 at 12.] But Defendants do not explain how Wedgewood's (a) knowledge of the statements in question and (b) belief therein would "sever the link between the alleged misrepresentation and [] the price * * * paid[] by the plaintiff." *Basic*, 485 U.S. at 248. If anything, Wedgewood's post-disclosure letter strengthens the link between the alleged misrepresentation and price paid. It does not appear that Defendants will be able to mount a "serious challenge" to MSPERS's typicality by subjecting it to a unique defense. *CE Design*, 637 F.3d at 728. Rather, MSPERS's claim, based on its presumptive reliance on market price, is typical in that it shares the "same essential characteristics as the claims of the class at large." *Retired Chicago Police Ass'n*, 7 F.3d at 596.

### b. MSPERS is an adequate class representative

Next, Defendant argues that MSPERS's cozy relationship with class counsel and supposed lapses in case management render it inadequate as lead plaintiff. MSPERS counters that it has ample experience as lead plaintiff, is invested in the litigation, and cannot be punished for the common practice of working closely with outside counsel to identify potential securities frauds.

First, the Court will not deny certification because of MSPERS's relationship with counsel. Some courts are skeptical of these arrangements, at least insofar as they lead to frivolous litigation

or are indicative of inherent conflicts of interest or unwillingness to manage counsel. *In re Kosmos Energy Ltd. Securities Litigation*, 299 F.R.D. 133, 149 (N.D. Tex. 2014); *Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing and Securitization, LLC*, 616 F.Supp.2d 461, 464 (S.D.N.Y. 2009) (criticizing portfolio monitoring, but appointing MSPERS lead counsel, because its portfolio monitoring program mitigated the possibility of frivolous litigation; Mississippi Special Assistant Attorney General George W. Neville "plainly had a sophisticated knowledge of" securities litigation; and the proposed lead counsel had not been the one to propose the litigation); but see *In re General Elec. Securities Litigation*, 2009 WL 2259502, at *6 (S.D.N.Y. July 29, 2009) (expressing skepticism that "monitoring by law firms truly presents a conflict of interest"). Others have brushed aside those concerns, especially considering that funds are the "exact type of sophisticated institutional investor that Congress intended to lead securities class actions under the PSLRA." *Milbeck v. TruCar, Inc.*, 2019 WL 2353010, at *3 (C.D. Cal. May 24, 2019) (finding institutional investor adequate although it maintained portfolio monitoring agreements with nine law firms; was indemnified by its counsel; and was a serial litigant) (citations and quotation marks omitted); *Burges v. Bancorpsouth, Inc.*, 2017 WL 2772122, at *5 (M.D. Tenn. June 26, 2017) (collecting cases); *In re Neopharm, Inc. Securities Litigation*, 225 F.R.D. 563, 568 (N.D. Ill. 2004) (reasoning that lead plaintiff's portfolio monitoring relationship with a law firm was evidence in favor of adequacy because it "illustrate[d] involvement in and awareness of the financial affairs at issue"); see also *Berg v. Guthart*, 2014 WL 3749780, at *4 (criticizing *In re Kosmos* and collecting cases that have "rejected the notion that the existence of a portfolio monitoring agreement with counsel renders a plaintiff unsuitable to represent the interests of a class"). Because (a) MSPERS is an institutional investor; (b) it maintains non-exclusive agreements with several law firms; and (c) it retains independence as to whether to sue and which

counsel to retain, [138-1 at 33–34], MSPERS's portfolio management arrangement does not render it inadequate. *Milbeck*, 2019 WL 2353010, at \*3; *Iron Workers Local*, 616 F.Supp.2d at 464; see also generally Michael J. Kaufman & John M. Wunderlich, *The Bromberg Balance: Proper Portfolio-Monitoring Agreements in Securities Class Actions*, 68 SMU L. Rev. 771 (2015) (reviewing case law and suggesting that non-exclusive portfolio monitoring agreements that provide for investors' independent decision-making do not render plaintiffs inadequate).

Second, Defendants argue that MSPERS is inadequate because its Chief Investment Officer, Lori Tingle, was insufficiently up-to-speed on the details of this case. Defendants also obliquely criticize Special Assistant Attorney General George W. Neville (the Mississippi state employee charged with overseeing this litigation), because he was unsure of whether the motion for class certification had been filed before his deposition.

"It is hornbook law \* \* \* that [i]n a complex lawsuit, \* \* \* the representative need not have extensive knowledge of the facts of the case in order to be an adequate representative." *Gunnells v. Healthplan Services, Inc.*, 348 F.3d 417, 430 (4th Cir. 2003) (quotation marks and citation omitted); see also 32B Am. Jur. 2d Federal Courts § 1533 (2020) (same). "An adequate class representative must maintain only an 'understanding of the basic facts underlying the claims, some general knowledge, and a willingness and ability to participate in discovery.'" *Walker v. Bankers Life & Cas. Co.*, 2007 WL 2903180, at \*6 (N.D. Ill., Oct. 1, 2007) (quoting *Wahl v. Midland Credit Management, Inc.*, 243 F.R.D. 291, 298 (N.D. Ill. 2007)). Indeed, an investor who "was unaware of what types of securities were traded by the money managers and did not know what criteria the managers followed in making investment decisions" and "did not have any input in the decision to buy or sell" may still be adequate if he or she was not "completely unaware of the relevant financial affairs and the purchase in the stock at issue." *Retsky Family Ltd. Partnership v. Price*

*Waterhouse LLP*, 1999 WL 543209, at *5–6 (N.D. Ill. July 23, 1999); cf. *Ocampo v. GC Services Limited Partnership*, 2018 WL 6198464, at *9–10 (explaining that demonstrating adequacy is "not difficult," but denying class certification when named plaintiff could not articulate, even in basic terms, what the lawsuit was about or what a class action is); *In re AEP ERISA Litig.*, 2008 WL 4210352, at *3–4 (S.D. Ohio Sept. 8, 2008) (denying class certification because lead plaintiff "had almost no involvement with his case whatsoever" "except for his deposition," and refused to read the complaint because "'I ain't got time. I'm too old to do much more than look at the first two or three pages.'"); but see *In re Kosmos*, 299 F.R.D. at 147 (imposing higher floor on lead plaintiff's knowledge); *Krim v. pcOrder.com, Inc.*, 210 F.R.D. 581, 588–89 (W.D. Tex. 2002) (same).[5]

MSPERS's supposed lapses in case management do not render it inadequate. Here, Tingle did not know exactly when MSPERS first purchased TreeHouse stock and was not aware of post-disclosure purchases.[6] And Neville seemed confused about when the motion for class certification had been filed. Regarding Tingle's admissions, she was not "completely unaware of the relevant financial affairs and the purchase in the stock at issue." *Retsky*, 1999 WL 543209, at *5. Indeed, she clearly understood the basics of the lawsuit and was willing to participate in discovery (as evinced by her deposition). *Walker*, 2007 WL 2903180 at *6. Any contrary conclusion requiring

---

[5] Defendants' reliance on *In re Kosmos*, is misplaced. *In re Kosmos* relied on the Fifth Circuit's idiosyncratic adequacy standards. See, *e.g.*, *In re Trans Union Corp. Privacy Litigation*, 629 F.3d 741, 744 (7th Cir. 2011) (explaining that "named plaintiffs are usually cat's paws of the class lawyers," and approvingly citing the Ninth Circuit's rejection of heightened adequacy standards, *In re Cavanaugh*, 306 F.3d 726, 737–38 (9th Cir. 2002)).

[6] Tingle also did not know why certain investment managers considered TreeHouse large cap, while others considered it small cap, and admitted that she had not personally read or relied on TreeHouses's statements. First, it is unclear how this cap confusion renders MSPERS an inadequate plaintiff—MSPERS maintains a large portfolio, and its employment of multiple managers who may use different investing criteria does not suggest that it is "completely unaware" of its investments. Indeed, in this case, Tingle testified that she maintains at least some oversight of managers. [129-2 at 70–78.] Second, MSPERS is seeking to certification on a fraud-on-the-market theory, which does not require plaintiffs to be aware of the misrepresentations.

securities fraud plaintiffs to perfectly withstand hours of deposition-Double-Jeopardy about their portfolios "would be in conflict with the PSLRA's purpose to 'increase the likelihood that institutional investors will serve as lead plaintiffs.'" *In re Neopharm*, 225 F.R.D. at 567 (quoting *In re WorldCom, Inc. Securities Litigation*, 219 F.R.D. 267, 282 (S.D.N.Y. 2003)). And, to the extent that Defendants argue that MSPERS is inadequate because of Neville's confusion regarding the class certification motion, he has done more than enough to satisfy the relatively low bar for demonstrating his adequacy. He testified in detail about the specifics of the alleged fraud and his investment in this case. [138-1 at 60–65; 93–95].

As a final note, the Court concludes that class counsel is adequate. In assessing the adequacy of class counsel, the Court considers "counsel's work on the case to date, counsel's class action experience, counsel's knowledge of the applicable law, and the resources counsel will commit to the case." *Reliable Money Order, Inc. v. McKnight Sales Co.*, 704 F.3d 489, 498 n.7 (7th Cir. 2013) (citing Fed. R. Civ. P. 23(g)(1)(A)). After considering counsel's work on the case to date and its record in securities litigation, see generally [35-4]; [35-5], the Court concludes that counsel is "experienced and competent." *Retired Chicago Police Ass'n*, 7 F.3d at 598 (7th Cir. 1993).

## B. Rule 23(b) Factors

In order for a class to be certified under Rule 23(b)(3), class issues must predominate over individual ones, the class action mechanism must be superior to alternatives, and the class members must be ascertainable.[7] Although related to the commonality requirement, "the

---

[7] Defendants do not contest that a class mechanism is superior to individual suits or that the implicit ascertainability requirement is satisfied. Regardless, the Court must consider: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). Here, all of the four factors weigh heavily

predominance criterion is far more demanding." *Amchem*, 521 U.S.at 624. It requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The predominance inquiry tests whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. Plaintiffs satisfy predominance requirement only if they can show that "'common questions represent a significant aspect of [a] case and * * * can be resolved for all members of [a] class in a single adjudication.'" *Messner*, 669 F.3d at 815 (citation and internal quotation marks omitted).

"Predominance is a test readily met in certain cases alleging consumer or securities fraud." *Messner*, 669 F.3d at 815 (quoting *Amchem*, 521 U.S. at 625); see also *Schleicher*, 618 F.3d at 686 (explaining that "[f]alsehood and materiality affect investors alike" and therefore certification of a securities fraud class under Rule 23(b)(3) was appropriate). That said, the Court must conduct "a 'rigorous analysis' into whether the plaintiffs' 'damages are susceptible of measurement across the entire class.'" *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 760 (7th Cir. 2014) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)). At the very least, "[t]hat requires matching the theory of liability to the theory of damages." *In re IKO Roofing Shingle Products Liability Litigation*, 757 F.3d 599, 602 (7th Cir. 2014) (explaining that plaintiffs may proceed on one of two

---

in favor of certification: it is unlikely that class members would want to individually control the prosecution of these claims given the small amount of money at stake for most of the individual plaintiffs; MSPERS has represented that it knows of no other individual case based on these facts; the putative class members are presumably dispersed throughout the country and TreeHouse is based in Illinois; and this case seems unlikely to pose any management difficulties greater than innumerable individual actions. Indeed, the superiority of the class mechanism to individual suits in securities fraud cases such as this is generally taken as a given. *E.g.*, *Washtenaw County Employees' Retirement System v. Walgreen Co.*, 2018 WL 1535156, at *5 (N.D. Ill. March 29, 2018) (citing *Roth*, 238 F.R.D.at 608; *In re AVEA Pharmaceuticals, Inc. Securities Litigation*¸ 2017 WL 5484672, at *7 (D. Mass. Nov. 14, 2017). Similarly, the class is defined clearly and objectively, with boundaries set both temporally and as to an identified type of security (common stock of TreeHouse purchased on the open market), thereby allaying any ascertainability concerns.

damages theories); see also *Comcast*, 521 U.S. at 38 ("The first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*.") (quotation marks and citation omitted). However, it would put "the cart before the horse to insist" that plaintiffs demonstrate that the proposed method will precisely and accurately prove their damages "before any class can be certified." *Schleicher*, 618, F.3d at 687. Thus, "plaintiffs are not required to prove" all of the elements of a Rule 10b-5 claim "at the class-certification stage," they need only show "that common questions '*predominate* over any questions affecting only individual [class] members.'" *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455, 468–69 (2013) (quoting Fed. R. Civ. P. 23(b)(3)).

Here, Defendants dispute whether the proposed damages model matches the theory of liability. MSPERS's expert, Chad Coffman, proposes using the "'out-of-pocket' method which measures damages as the artificial inflation per share at the time of purchase less the artificial inflation at the time of sale." [126-3, ¶ 77.] Coffman proposed using an "event study" examining investors' reactions to disclosures to determine the degree of inflation; individual damages "could then be calculated formulaically." [*Id.* at ¶ 78.] Defendants argue that Coffman's damages model (1) fails to account for confounding news on November 3, 2016, and (2) improperly assumes that the price of TreeHouse stock was invariantly inflated throughout the Class Period. MSPERS counters that it need only show that it *could* develop a model that accounts for these limitations.

First, Defendants argue that Coffman's proposed event study cannot disaggregate the news regarding the failed integration of Private Brands from the possibly unrelated news of the CEO's departure. Relatedly, Defendants insinuate that Coffman will be unable to disaggregate any drops in stock prices related to Flagstone and Private Brands. But, of course, all the putative class members' claims will live or die by their ability to disaggregate potentially confounding news,

making the question "common" to all of the members. See, *e.g.*, *Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at *9 (N.D. Cal. March 16, 2016) (explaining that "an attack [on] the 'fit' between an alleged corrective disclosure and a prior alleged fraudulent statement [] is nothing more than an attack on loss causation."); *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011) (*Halliburton I*) ("The Court of Appeals erred by requiring [plaintiff] to show loss causation as a condition of obtaining class certification."); see also *Schleicher*, 618 F.3d at 685 ("Under the current rule, certification is largely independent of the merits * * *, and a certified class can go down in flames on the merits.").

Moreover, Defendants complain that Coffman has proposed "the same nonspecific theory [] at least five times in the past four years," but do not cite a single case where this this nonspecific theory was rejected. See [129 at 2]. MSPERS, in contrast, has included an appendix including dozens of cases in which Coffman's expert opinions have supported the certification of a class. [138-5 at 35–38]. And using an event study to determine out of pocket losses due to inflation is "widely considered an accepted method for the evaluation of [] damages to a class of stockholders in a defendant corporation," even in the face of confounding information. *In re Intuitive Surgical Securities Litigation*, 2016 WL 7425926, at *17 (N.D. Cal. Dec. 22, 2016) (holding that common issues predominate notwithstanding defendants' challenge to Coffman's proposed "out-of-pocket" method); see also, *e.g.*, *Weiner v. Tivity Health, Inc.*, ___ F.R.D. ___, 2020 WL 467783, at *11 (M.D. Tenn. Jan. 29, 2020) (collecting cases and concluding that Coffman's out-of-pocket method will not let individual questions predominate), appeal docketed No. 20-501 (6th Cir. Feb. 13, 2020); *In re SanDisk LLC Securities Litigation*, 2018 WL 4293336, at *2 (N.D. Cal. Sept 4, 2018) ("The admittedly short portion of the Coffman report addressing this damages methodology, coupled with its general acceptance, suffices to show for class certification purposes that classwide

damages can be determined without excessive difficulty and attributed to [the plaintiffs'] theory

of liability.") (citation and quotation marks omitted); *Carpenters Pension Trust Fund of St. Louis

v. Barclays PLC*, 310 F.R.D. 69, 99 (S.D.N.Y. 2015) (holding that plaintiffs' damages model

"survive[d] the minimal scrutiny required" at the certification stage although the expert had not

yet "adjust[ed] for any confounding news"); cf. *Baker v. SeaWorld Entertainment, Inc.*, ___ F.

Supp. 3d ___, 2019 WL 6118448, at * 11–13 (S.D. Cal. Nov. 18, 2019) (reviewing a *Daubert*

motion, well after the class had been certified, and concluding that "Coffman's disaggregation

opinions are admissible"); [138-5, ¶ 32].[8] All of this indicates that the theory of liability matches

the theory of damages. *Comcast*, 569 U.S. at 35.

Defendants' related point about Flagstone remains opaque. As Defendants implicitly note,

their objections regarding the Flagstone acquisition and disclosure are flavors of their broader

---

[8] Defendants cite several cases for the proposition that the Court should deny class certification because Coffman's descriptions are too sketchy. These cases are inapposite. In *Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116 (S.D.N.Y. 2014), the plaintiff's expert determined that the market for the security was illiquid during much of the class period, and thus presented unique individualized difficulties concerning the congruence between liability and damages calculation. *Id.* at 141–142. Moreover, that case's application of *Comcast* was at odds with that of the Seventh Circuit. Compare *id.* at 141, with *Butler v. Sears, Roebuck and Co.*, 727 F.3d 796, 799–801 (7th Cir. 2013). In *Ohio Public Employees Retirement System v. Federal Home Loan Mortgage Corporation*, 2018 WL 3861840 (N.D. Ohio Aug 14, 2018), the court excluded the expert's testimony and struck the report because parts of it were "entirely improper." *Id.* at *7. And, in any event, the court also held that the plaintiffs' liability theory did not hold together—little wonder that the court went on to hold that there was no congruence between the inadequate liability theory and sketchy theory of damages. *Id.* at *17–20. *Smilovits v. First Solar Incorporated*, 119 F. Supp. 3d 978 (D. Ariz. 2015) is off base in that it concerned a motion for summary judgment, not class certification. *Id.* at 981; see also *Smilovits v. First Solar, Inc.*, 295 F.R.D. 423, 427 (D. Ariz. 2013) (granting motion for class certification). And, in any event, it is factually far afield in that it rested its holding on the fact that the press release announcing the CEO's departure "that caused the stock price to drop did not include any information about the company's financial performance," or any other issue potentially relevant to the alleged misrepresentations; here, however, the press release mentioned both. See *Smilovits*, 119 F. Supp. 3d at 997. Finally, *Werdebaugh v. Blue Diamond Growers*, 2014 WL 7148923 (N.D. Cal. 2014), *decertified* a class after the plaintiff's expert submitted a damages report that did not even attempt to disaggregate confounding information. *Id.* at *9–10. If anything, *Werdebaugh* counsels a flexible, iterative approach whereby the Court grants certification and revisits that decision if Coffman fails to make good on his promises. See *id.* at *9; see also *In re Snap Inc. Securities Litigation*, ___ F.R.D. ___, 2019 WL 6270291, at *5 (C.D. Cal. Nov. 20, 2019), appeal docketed 19-80157 (9th Cir. Dec. 4, 2019) (distinguishing *Werdebaugh* on other grounds).

disaggregation argument; for the reasons set forth above, common questions predominate about how to deal with Flagstone notwithstanding this methodological critique. See *Vrakas v. United States Steel Corporation*, 2019 WL 7372041, at *8–9 (W.D. Penn. Dec. 31, 2019).

Second, Defendants argue that Coffman's event study framework is necessarily inadequate to address all the complexities attendant in determining each investor's actual losses. All kinds of factors affect a stock's price on any given day—the effect of any misrepresentation therefore fluctuates over time as investors incorporate that information with the myriad other inputs that go into buy-sell-hold decisions. And, specifically, it is likely that investors identified *some* risk in the Private Brands venture, even if TreeHouse publicly understated that risk. Defendants, however, do not cite a single case where class certification was denied because of limitations in the proposed inflation formula.[9] Indeed, using inflation to determine plaintiffs' out-of-pocket losses is a common methodology in securities fraud cases such as this, and the limitations Defendants identify are not unique to this case and need not be resolved before the class is certified. *E.g.*, *Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 451 (W.D. Tex. 2019); *In re Silver Wheaton Corp. Securities Litigation*, 2017 WL 2039171, at *15 (C.D. Cal. May 11, 2017); *In re Intuitive Surgical*, 2016 WL 7425926 at *17; *Hatamian*, 2016 WL 1042502, at *9–10; see also [138-5, ¶¶ 18–25, 35 ("In virtually every securities fraud case, there is expert analysis and dispute regarding whether and to what extent the artificial inflation may have evolved over the class period.")] And the mere fact that the plaintiffs may ultimately offer ambiguous or unconvincing evidence is not reason to deny

---

[9] Instead, Defendants rely on their expert's report. But Dr. Zurek's opinions are more of an attack on the Supreme Court's *Basic* decision than Coffman's proposed methods: "The absence of such a methodology to calculate inflation does not necessarily mean that damages cannot be calculated at all, just that class-wide damages based on inflation cannot be. For example, it is possible to require every purchaser to establish that they relied on the alleged misstatements at the time of purchase * * *." [129-7 at 8 n.10.] Of course, the fraud-on-the-market theory does not require purchasers to establish reliance on anything other than the market price. If Defendants have a problem with that, they will need to take it up with the Supreme Court.

certification. *Schleicher*, 618 F.3d at 687. Thus, the issues regarding inflation do not preclude certification.

## IV.     Conclusion

For the reasons set forth above, MSPERS's motion for class certification [125] is granted. The case is set for further status on March 10, 2020 at 9:00 a.m.

Dated:  February 26, 2020

_____
Robert M. Dow, Jr.
United States District Judge